FORTHRIGHT LAW, P.C.
DOW W. PATTEN (SBN: 135931)
50 California St., Suite 1500
San Francisco, California 94105
Telephone (415) 228-6848
Facsimile (415) 228-6876
dow@forthrightlaw.com

JOHN RARICK, ESQ. (SBN: 285862)
107 W. Perkins Street, Suite 16
Ukiah, CA 95482
(t) 707.343.0529
(c) 415.606.1689
(f) 888.565.9627
 jr@lawbyjcr.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTIRCT COURT**

**FOR THE NORTHEN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BARBARA HOWE; L. JANI SHEPPARD; and CAROL MORGAN<br><br>Plaintiffs;<br><br>v.<br><br>THE COUNTY OF MENDOCINO, TAMMY MOSS CHANDLER; WILLIAM SCHURTZ; SHARON CONVERY; KATHERINE FENGLER, and DOES 1-70, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1) 42 U.S.C. §1983 - 1ˢᵗ Amendment**<br>**2) 42 U.S.C. §1983 - 1ˢᵗ Amendment**<br>**3) 42 U.S.C. §1983 - Retaliation**<br>**4) 42 U.S.C. §1983 - Retaliation**<br>**5) 42 U.S.C. §1983 – Wrongful Termination**<br>**6) 42 U.S.C. §1983 – Wrongful Termination**<br>**7) Retaliation (Cal. Lab. Code §1102.5)**<br>**8) Discrimination (FEHA)**<br>**9) Retaliation (FEHA)**<br>**10) Harassment (FEHA)**<br>**11) Intentional Infliction of Emotional Distress**<br>**12) Breach of Contract**<br>**13) Intentional Interference With Prospective Economic Advantage**<br>**14) Failure to Provide Name Clearing** |

PLAINTIFFS, BARBARA HOWE ("Ms. HOWE"); L. JANI SHEPPARD ("Ms. SHEPPARD") and CAROL MORGAN ("Ms. MORGAN) file this Complaint for Damages and Injunctive Relief on personal knowledge as to their own actions and on information and belief

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

as to the actions, capabilities and motivation of others and allege as follows:

**PARTIES**

1.      PLAINTIFF, Ms. HOWE, at all relevant times herein, was a resident of Ukiah, in Mendocino County, CA. At all times herein relevant, Ms. HOWE was an employee of County of Mendocino, Health and Human Services Agency ("HHSA").

2.      Ms. HOWE began working for HHSA in October of 2017, in the position of Assistant HHSA Director.   Throughout her employment with the COUNTY Ms. HOWE was covered by one or more agreements, the County's civil service rules and County ordinances against any adverse employment changes without cause and due process.

3.      PLAINTIFF, Ms. SHEPPARD, was a resident of Ukiah, in Mendocino County, CA during the matters alleged below, and is a resident of Perris, California. At all times herein relevant, Ms. SHEPPARD was an employee of County of Mendocino, Health and Human Services Agency, and as of the date of the filing of this Complaint has been placed on Administrative Leave.

4.      Ms. SHEPPARD began working for HHSA in May of 2018, in the position of Senior Program Specialist, promoted to Program Administrator on November 18, 2018, then promoted to Senior Program Manager, March 24, 2019, then demoted two positions to Senior Program Specialist, March 26, 2020, and after fierce protest and the hiring of counsel she was reinstated at a one full-level demotion to her current position, Senior Program Manager, April 13, 2020.

5.      PLAINTIFF, Ms. MORGAN, at all relevant times herein, was a resident of Lake County California and works for the COUNTY. Since December 2017, Ms. MORGAN was been employed by the COUNTY in the Health and Human Services Agency, and was constructively discharged on November 30, 2020.

6.      Ms. MORGAN is a registered nurse (R.N.) with professional obligations to the State of

2

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

California and the Federal Government for the delivery of medical services to Foster Children. Ms. MORGAN began working for HHSA in December of 2017, in the position of Senior Nurse Case Manager and R.N.

7.      DEFENDANT COUNTY is a municipal corporation operating under the laws of the State of California and the laws and regulations of the United States of America.

8.      DEFENDANT TAMMY MOSS-CHANDLER ("TMC") is an individual residing in the County of Mendocino who was at most times herein relevant the Director of the HHSA.

9.      DEFENDANT WILLLIAM SCHURTZ ("SCHURTZ") is an individual residing in the County of Sonoma who was at most times herein relevant employed as Director of Administrative Services for HHSA and later promoted to his current position as Director of the Human Resources Department ("HR") for the COUNTY.

10.     DEFENDANT SHARON CONVERY ("CONVERY") at all times herein relevant was an individual residing in County of Mendocino and was an employee in HHSA reporting to Ms. HOWE.  After Ms. HOWE's forced termination, Ms. CONVERY reported to Contractor Carol Mordhorst and then Interim Public Health Director Jody Johnston. CONVERY is the current Senior Program Manager with HHSA Public Health and under state and federal mandates to deliver Communicable Disease Prevention Intervention, Immunizations, Emergency Preparedness and medical services to Foster Children.

11.     DEFENDANT KATHERINE FENGLER  ("FENGLER") at all times herein relevant was an individual residing in County of Mendocino and was an employee in HHSA.

12.     PLAINTIFFS and each of them are ignorant of the true names, business organization, legal organization, business location, legal jurisdiction, and relationships and capacities of defendants sued herein as DOES 1 through 10, inclusive and therefore sue these defendants by such fictitious names.  PLAINTIFFS will amend this Complaint to allege their true names,

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

business organization, legal organization, business location, legal jurisdiction, and relationships and capacities to and with the COUNTY, TMC, SCHURTZ, CONVERY, and FENGLER when ascertained.  Each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, that such defendants owed a duty of due care to each PLAINTIFF and that PLAINTIFFS' damages were proximately caused by the acts and omissions of DOES 1 through 10, and each of them acting in their agency and capacity on behalf of the COUNTY, TMC, SCHURTZ, CONVERY, and FENGLER.

13.     Plaintiffs are ignorant of the true names and capacities of individual persons sued herein as DOES 11-70, inclusive, and therefore sue these defendants by such fictitious names. PLAINTIFFS will amend this Complaint to allege their true names, agency relationship to the other Defendants and capacities when ascertained.  Each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, that such defendants owed a duty of due care to all PLAINTIFFS, and that PLAINTIFFS' damages were proximately caused by the acts and omissions of DOES 11-70, inclusive, and each of them.

14.     Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned herein defendants were the agents, servants, employees and/or joint venturers of the other defendants. Plaintiffs are further informed and believe and on that basis allege, that each of the defendants consented to, ratified, participated in, or authorized the acts of the remaining defendants.

**JURISDICTION AND VENUE**

15.     PLAINTIFFS bring this action pursuant to the laws of the State of California, California Fair Employment and Housing Act, California Labor Code, Title VII of the 1964 Civil Rights Act, as amended, and 42 U.S.C. §1983.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

16.     Jurisdiction for the PLAINTIFFS' state-law claims is founded upon 28 U.S.C §1332, supplemental jurisdiction.

17.     Venue is proper in this judicial district because PLAINTIFFS' injuries, damages and harm, including the violation of their Civil Rights occurred in this judicial district. Further, one or more of the DEFENDANTS reside, are headquartered, and conduct business in this judicial district.

18.     DEFENDANT COUNTY is a public entity and subdivision of the State of California and regularly employs fifteen (15) or more persons.

19.     DEFENDANT COUNTY conducts its business and operates under the color of state authority in this judicial district and the HHSA is a subdivision of the COUNTY.

20.     DEFENDANTS are subject to suit in this Judicial District and are public entities that regularly employ 15 or more persons.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21.     Ms. HOWE has exhausted her administrative remedies by complying with the Government Claims Act; California Government Code §§ 810 *et. seq*.  On or about February 6, 2020, the COUNTY provided a written response denying her demand in her Second Amended Complaint & Government Claim ("SACGC"), which was made part of the Original Claim, filed on August 27, 2019, and the First Amended CGC filed on November 6, 2019, ("FAGC") and filed for all purposes pursuant to Government Code §910.6.

22.     Ms. SHEPPARD joined Ms. HOWE's SACGC and forty-five (45) days passed without any response from the COUNTY to her claims in the SACGC; therefore she too has exhausted her administrative remedies by complying with the Government Claims Act.

23.     Ms. MORGAN has exhausted her administrative remedies by complying with the Government Claims Act; California Government Code §§ 810 *et. seq*.  On or about June 10,

2020 she filed a Complaint and Government Claim with the Clerk of the COUNTY. Forty-five (45) days past without any written response from the COUNTY to her claims.

24.    Ms. HOWE has exhausted her administrative remedies by filing charges of harassment and retaliation with appropriate state agencies and by complying with the Government Code, DFEH Matter Number-202004-09914414.

25.    Ms. SHEPPARD has exhausted her administrative remedies by filing charges of harassment and retaliation with appropriate state agencies and by complying with the Government Code, DFEH Matter Number-202004-09913114.

26.    Ms. MORGAN has exhausted her administrative remedies by filing charges of harassment and retaliation with appropriate state agencies and by complying with the Government Code, DFEH Matter Number-202008-10974214.

### WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

27.    Each and every wrongful, injurious, intentional, willful, discriminatory, harassing act, and failure to act, by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain. Thus, Workers Compensation exclusive remedy set forth in California Labor Code §3600 et seq. will not preempt, nor bar PLAINTIFFS' rights to recover for damages set forth herein.

### INTRODUCTION

28.    PLAINTIFFS have over one-hundred (100) years of combined experience working in large public institutions addressing complex organizational, planning, and accountability challenges the COUNTY faces.

29.    PLAINTIFFS made complaints, exercised their rights to free speech regarding matters of heightened public concern, and resisted unlawful practices engaged in by the COUNTY;

6

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

thereafter, they were subject to adverse employment actions.

30.    The retaliation engaged in by Defendants has impeded and interfered with significant public health, welfare and safety programs and services, damaging the health, safety and welfare of the community.

## COUNTY POLICIES

31.    "Administration of the Civil Service System of the County of Mendocino shall be based on the principle of employment and promotion on a merit basis for the purpose of obtaining the highest efficiency and assuring the best qualified persons available shall be employed in the service of the County, keeping in mind the relationships with and obligation to: (1) The public at large…" ("Civil Service System").

32.    County Ordinance 2.44.010 states:

> "In compliance with Section 450, California Health and Safety Code, the full-time Mendocino County Department of Public Health is hereby established, and its personnel, services, functions and administration shall conform to the minimum requirements of the State of California Department of Public Health Regulations governing State and Federal Financial assistance to local health departments. In accordance with directives from the State of California Division of Local Health Services, setting forth minimum requirements as to personnel, standards and services and recommending minimum salaries, travel allowances, laboratory services, capital outlay, maintenance and operational expenses, the following sections of this Chapter are herein authorized, ordained and provided for.

33.    County Ordinance 2.44.030 states:

> "All other Health Department positions hereinafter set forth shall be filled or vacated as follows: All recommendations for appointment or dismissal shall be submitted by the County Health Officer to the Board of Supervisors who shall act as a Health Department personnel board; they shall act to confirm or deny said recommendations at their first regular meeting thereafter. All Health Department employees shall have first priority in the filling of vacancies occurring in a higher position, provided said employees meet the State minimum educational, professional and experience requirements for the position. All actions of the board in appointments, promotions or dismissals

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

relative to Health Department positions shall be in writing, and due notice by letter shall be delivered, mailed or handed to those persons or employees concerned."

34.    COUNTY Ordinance 3.16.130 states:

"Any officer or employee in the classified civil service may be dismissed, suspended or reduced in rank or compensation by the appointing authority of the County after employment or promotion is complete by a written order, executed by such appointing authority, stating specifically the reasons for this action. The order shall be filed with the Director of Human Resources and a copy thereof shall be furnished to the person afflicted thereby. Such dismissal, suspension or reduction in rank or compensation shall be final unless such officer or employee files a reply in writing to such order with the Director of Human Resources and requests an appeal to the Civil Service Commission within ten (10) days after the receipt of the original order; appointing authority in a dismissal, demotion, or suspension may take the action effectively immediately."

35.    The COUNTY'S Civil Service Ordinance requires that a "written order" shall be issued "stating specifically the reason for the [dismissal suspension or reduction] action.

36.    The COUNTY'S Ordinance 2.44.010 et. seq. demands that the "Board of Supervisors [] shall act as a Health Department personnel Board;….All actions of the board in appointments, promotions or dismissals relative to Health Department positions *shall be in writing*, and due notice by letter shall be delivered, mailed or handed to those person or employees concerned. " (COUNTY Ordinance 2.44.030) (Emphasis added.)

37.    Pursuant to California Welfare and Institutions Code §§ 5600 et .seq. (the Bronzan-McCorquodale Act, "WIC") the COUNTY shall "determin[e] [] the need for and the allocation of mental health resource." "…[P]ublic mental health services in this state should be provided to priority target populations in systems of care that are client-centered, *culturally competent, and fully accountable*,…." (*See* WIC §5600.2 (a), emphasis added.)

38.    The County shall provide mental health services with Cultural Competence; meaning: "[a]ll services and programs at all levels should have the capacity to provide services sensitive

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

to the target populations' cultural diversity."  (*See Id*. (g).)

39.    California Labor Code Regulations defines "dishonesty as such acts and statements as lying, theft, making false entries on records and other actions showing a lack of truthfulness and integrity." (See Title 22, Section 1256-34(a).)  An employee may be discharged for an act of dishonesty.  Dishonesty includes "aiding or abetting another in committing a dishonest act," (*See* Id. (b),) 2) "false statements about coworkers or employer," (*See Id*. (e),) 3) "falsification concerning work, work record including time card," and 4) "falsification of work application." (*Id*.)

## COUNTY PRACTICES

40.    Defendant, County of Mendocino ("COUNTY") and the Board of Supervisors ("BoS"), by and through their Managing Agents have an established practice of failing to formally establish and monitor policies to address county-wide issues of public safety, health, economic, environmental and other needs of the community.

41.    The Managing Agents ("Managing Agents") of the COUNTY filled the vacuum created by the established practice of the COUNTY and BoS to fail to formally establish and monitor policies by establishing discriminatory and unlawful practices to benefit their individual and collective interests, particularly in the COUNTY's HEALTH AND HUMAN SERVICES AGENCY ("HHSA").

42.    As a result of COUNTY's practice of failing to formally establish and monitor, employees within HHSA and the mission of HHSA itself have suffered from the discriminatory and unlawful practices set up and maintained by the Managing Agents, resulting in discrimination, retaliation, maintenance of a hostile work environment, denial of free speech and due process, compelled unlawful and fraudulent speech and other unlawful conduct from which DEFENDANTS individually and collectively benefit at the expense of the workforce,

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

PLAINTIFFS, and the public at large.

43.    As a result of COUNTY's practice of failing to formally establish and monitor, the Managing Agents exercise and maintain power and control over the spending of public monies through the HHSA by discriminatory and unlawful practices.

44.    For the better part of a decade, COUNTY, through the BoS has engaged in the practice of failing to formally set policy for the HHSA, permitting the Managing Agents to establish and maintain ad-hoc policies and practices funneling COUNTY resources to particular districts and special-interest groups.

45.    The unlawful conduct of DEFENDANTS against PLAINTIFFS denies the Community the benefits of a merit-based civil-service system that attracts, hires, and rewards individuals for their commitment to their field of practice, their performance, the acquisition of and focus-on the fulfillment of the Community's trust and diversity and needs, respectively.

46.    The unlawful conduct of DEFENDANTS against PLAINTIFFS, denies the Community of basic public safety and health planning that are now severely needed, but are not in place because of the DEFENDANTS' failures.

47.    The unlawful conduct of DEFENDANTS against PLAINTIFFS reduces the applicant pool for crucial public safety and health positions.  As a result, only severely compromised individuals apply for open positions because they have no other options and they would not be accepted by other jurisdictions.

48.    The PLAINTIFFS and each of them have suffered unlawful adverse employment actions, up to and including termination of employment because DEFENDANTS' conduct.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### BARBARA HOWE

49.    PLAINTIFF HOWE is a female, heterosexual, above the age of 40.

50.     HOWE was employed by the COUNTY, from about October 16, 2017 to May 24, 2019, with a pay-out date of about May 30, 2019.  HOWE was an Assistant Director in HHSA.

51.     HOWE has an extensive career in public-health administration spanning over thirty-four (34) years.  She received her Bachelor's of Science degree from U.C. Davis and her Master's of Science degree in Public Nutrition from the University of New Haven.  She began her career in Merced, California administering California's Women, Infants and Children (WIC) program.

52.     While working for the State of Nevada, she was a candidate for an open school-board seat and won.  Her campaign was based upon "for the health of it."  During her tenure on the school board she implemented a dozen health policies and was President of the Board her last year.

53.     The Soroptimist International organization honored HOWE by selecting her for the "Women Helping Women" Award.

54.     For the ten years prior to her employment with the COUNTY, she re-shaped and re-organized public-health agencies for the County of Humboldt and most recently the State of New Mexico.

55.     HOWE relocated to Mendocino County from New Mexico under the COUNTY's offer and promise that she would be given the resources and latitude to transform a sclerotic public-health organization into a responsive and responsible organization.

56.     Other than making the public-health agency organization responsive and responsible, HOWE was never provided official documentation about her role, responsibilities, obligations and other normal and customary parameters for the terms and conditions of her employment with the COUNTY.

57.     Upon her arrival HOWE was shocked to learn that HHSA, in general and Public Health, in particular, had few established policies and protocols; the few that were written were

11

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

sporadically followed. For example, no strategic planning process to devise, implement, manage and measure the effectiveness of programs and services attempted by the COUNTY existed.

58.    HOWE found the lack of clearly-established policies and protocols created confusion and disharmony among co-workers and caused a negative impact on employees who did not enjoy preferential treatment, decimating morale.

59.    In her first-quarter, 2018 review, Ms. HOWE was rated standard or above standard on all measures.

60.    Ms. HOWE's duties were modified to "Guide the Emergency Preparedness" transfer, which also incorporated her performance and reward bargain under "Leadership Mendocino."

61.    In her second- and third-quarter combined 2018 review, Ms. Howe again rated standard or above standard on all performance measures.

62.    Ms. HOWE exceeded her goals implementing public-health programs and services from her first-quarter 2018 review.

63.    Ms. HOWE's more pertinent performance achievements were "system improvements" arising from her role in the July/August 2018 emergency responses to the July/August fires, purchase of durable medical equipment and other resources for the Regional Medical Reserve Corps, and development of plans to operate "clinics [] off-site at shelter during emergency."

64.    Ms. HOWE's October 2018 review appears to be her last documented Employee Performance Report and Review before her termination, under duress and without due process.

65.    One of Ms. HOWE's responsibilities was to "provide clear expectations to [Public Health] staff around emergency response.  Test and drill PH staff accordingly. Continue coordination with the County Office of Emergency Services.  Re-draft Emergency Preparedness Plans by June 30, 2019."

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

66.     Ms. HOWE delivered responsive and responsible government programs and services, creating the framework for completing the backlog of programs and services, like cultural competency policies mandated by the State for the delivery of Emergency Medical Services (EMS) and behavioral health and recovery services to diverse and underserved communities. (*See* WIC §5600.2)

67.     After her separation from employment with the COUNTY in May of 2019; HOWE requested her personnel file and "any documents signed by her."

68.     On or about July 22, 2019, HOWE received an electronic copy of her personnel file, all documents that she signed, wage statements and related documents, which did not contain any signed documents that indicate she was an at-will employee or that she was *not* protected by the Civil Service System or other rules and regulations against dismissal without cause.

69.     DEFENDANTS' termination of Ms. HOWE, and its unlawful conduct with respect to Ms. SHEPPARD and MS. MORGAN have severely compromised the COUNTY's COVID-19 Pandemic response for diverse and underserved communities.

### L. JANI SHEPPARD

70.     PLAINTIFF, SHEPPARD is an African American female, heterosexual above the age of forty (40).

71.     On or about May 20, 2018, SHEPPARD joined the COUNTY as a Senior Program Specialist.

72.     Ms. SHEPPARD has 30 years of experience as an Executive Director, Chief Executive Officer, and Organizational and Leadership Development Professional/Consultant with a specialty in diversity and cultural competence.

73.     Ms. SHEPPARD is a current employee of DEFENDANT, COUNTY, and she is in good standing, with extraordinary salary acknowledgements.  She has satisfied the

13

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

probationary requirements of the Civil Service System for each of the positions that she held and currently holds.

74.    Ms. SHEPPARD is protected under the COUNTY's the Civil Service System, ordinances, and policies and procedures against the conduct herein alleged.

75.    On or about November 18, 2018, she was promoted to Program Administrator with a merit-pay increase to "level 5," the highest pay grade in any given pay level.

76.    SHEPPARD's responsibilities continued to rapidly expand and during the first quarter of 2019 she was placed as the Acting Senior Program Manager.  During the first quarter, TMC assigned SHEPPARD to the crucial LEMSA workgroup.  (*See* GJ-20 EMC Report, below.)

77.    HOWE recognized that SHEPPARD was a very hard working, capable, and knowledgeable employee, allowing Ms. SHEPPARD to exercise her leadership in diversity and cultural competency, contribute to best management and Public Health practices and support her in her career development.

78.     Prior to DEFENDANT's adverse actions against SHEPPARD; she was promoted again and given merit pay-raises due to her skills, performance, contributions and experience. SHEPPARD earned additional performance raises (from step 1 to 5), which requires performance well above Outstanding on most if not all of the nearly thirty (30) performance rating criteria used to implement the COUNTY's merit system.

79.    Notwithstanding her merit increases, Ms. SHEPPARD continues not to receive mandatory performance reviews, with the exception of her five (5) month review.  The COUNTY has also been unresponsive and very slow to respond to Ms. SHEPPARD's requests for personnel records.

80.    From the beginning of SHEPPARD's employment, TMC has misled and deceived Ms. SHEPPARD regarding her employment status within the COUNTY's Civil Service System.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

81.    TMC threatened Ms. SHEPPARD, informing Ms. SHEPPARD was an at-will employee *not* subject to the County HHSA Ordinance, the Civil Service System and other protections in an effort to dissuade SHEPPARD from preserving and protecting her rights.

82.    TMC routinely sent messages to Ms. SHEPPARD that she was the prime suspect in disseminating information to Ms. HOWE about "Dis-ease" on the HHSA white boards.  TMC propagated this falsehood to deceive HHSA staff about Ms. HOWE's compelled termination, all of which are violation of Labor regulations against false statements and reports.

83.    TMC made false statements to Ms. SHEPPARD about her employment status in an effort to dissuade SHEPPARD from preserving and protecting her rights.

84.    Ultimately, beginning in the Fall of 2019, the DEFENDANTS launched a retaliatory and unfounded racial discrimination investigation against SHEPPARD for providing training to HHSA staff regarding Health Inequities and Social Determinants of Health.   SHEPPARD'S trainings were  approved by the Centers for Disease Control ("CDC") and the Public Health Institute.

85.    State and Federal statutes as well as the Public Health Accreditation on Board Standards (PHAB) mandate cultural competency training.  SHEPPARD complied with those mandates by performing the training.

86.    Following the training in July 2019, Defendant FENGLER approached tobacco staff member Mr. Colson and stated "it's time for her to go and if it all goes well, we won't have to worry about her soon."

87.    Shortly thereafter, the Union representative and friend of Ms. Corrado to whom Ms. Corrado presented her grievance regarding her unsatisfactory performance review, told Mr. Colson " that bitch has to go."

88.    After the Discrimination Investigation ended in January, 2020, the investigating law

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

firm under the direction of Morin J. Jacob absolved Ms. SHEPPARD of any wrongdoing.

89. DEFENDANTS failed to provide Ms. SHEPPARD with promised information and a final report about the source of the false reports .

90. On or about January 27, 2020, Ms. SHEPPARD joined Ms. HOWE and together they filed a Second Amended Government Claim ("SACGC").

91. Without warning or the required notice to Ms. SHEPPARD under the Civil Service System and the HHSA ordinance, DEFENDANTS demoted Ms. SHEPPARD two positions.

92. SCHURTZ falsely claimed that Ms. SHEPPARD did not successfully complete her probationary periods for her previous and current positions.

93. SCHURTZ, working under TMC's instructions, made false representations to SHEPPARD regarding her employment status in an attempt to deceive her into believing that she was not protected by the Civil Service System and was not a member of the union.

94. SCHURTZ represented in his written correspondence that the unlawful two-position demotion issued to Ms. SHEPPARD was not appealable, and parroted TMC's deceit that Ms. SHEPPARD was not covered by the Civil Service System, the HHSA ordinance, and did not have union representation.

95. Ms. SHEPPARD had ten (10) very short days to understand her true rights and respond to the retaliatory demotion.

96. TMC's and SCHURTZ' conduct are false statements and reports against SHEPPARD in violation of California Labor Regulations.

97. TMC by and through SCHURTZ made false statements of fact concerning Ms. SHEPPARD's probationary status. DEFENDANTS failed to perform their obligations under the policies for written performance reviews, which complicated and distorted Ms. SHEPPARD's personnel record.'

16

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

98.    Having failed in their unlawful scheme to terminate Ms. SHEPPARD or force her out due to intolerable working conditions, on or about March 26, 2020, DEFENDANTS demoted SHEPPARD two positions.

99.    The two position demotion was made with knowledge of SHEPPARD's protected activities in (1) joining Ms. HOWE's SAGC, (2) making complaints of discrimination, (3) and speaking on matters of public interest, such as the lack of cultural competency, the failure of DEFENDANTS to deliver responsive and responsible government programs and services, and her refusal to engage in compelled speech for the benefit of preferred employees.

## CAROL MORGAN

100.    Concurrently with the failed Discrimination Investigation into SHEPPARD, Ms. MORGAN suffered adverse actions by DEFENDANTS.

101.    Ms. HOWE filed her SACGC on January 27, 2020.

102.    Ms. MORGAN brought a wealth of experience as a Registered Nurse (R.N.) to her position at the COUNTY.

103.    Ms. MORGAN received a scholarship for and graduated *Cum Laude* from the University of Ottawa, Canada with a Bachelor's degree in Nursing.  Over her thirty-five (35) year career including work as an R.N. for 1) the Salinas Valley State Prison Hospital, Salinas, CA as the Supervising R.N. delivery mental health services to inmates; 2) the Loma Linda University Health Care Center as a research R.N. ; 3) the County of Lake, California delivering Home Visitation services to families; and 4) Orange County California as the Public Health R.N. for the ACT Program.

104.    Ms. MORGAN is an R.N., licensed in California and Arizona and has a specialty Public Health Nurse license in California.  Her deep and wide experiences also include research, publication, and the over-the-counter drug approval process.  In 2000, she presented at the first

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Avon Breast Cancer Symposium held at U.C. Irvine and she received a certificate of appreciation for her contributions to the Institute for Biological Research and Development.

105.    In December 2017, Ms. MORGAN began working for HHSA as a Senior Public Health Nurse in the Foster Care Program. Duties included but were not limited to case management for children in the foster care system. She had positive performance reviews, and was promoted to Step 3 in her position.

106.    At the end of 2019 and early 2020, the COUNTY sought to appoint a person for a promotional position applying the County civil service rules and ordinances for the health agency.

107.    In violation of law, DEFENDANTS promoted a less-qualified preferred candidate over one selected pursuant the written policies.

## GRAND JURY 2018-2019 AND 2019-2020

108.    In 2007, the BoS adopted a CEO position, replacing the previous Chief Administrative Officer position which had very limited power to appoint or dismiss department/agency heads.

109.    Since 2007 and the arrival of DEFENDANTS, the COUNTY transformed from a somewhat accountable and responsible government to a self-serving organization, dominated by self-serving officials and the creation of unlawful policies and procedures.

110.    The CEO experiment has failed in that personal and special interests dominate the day-to-day, week-to-week, etc. narrative.  The operational decision-making subordinates the public at large to DEFENDANTS' favored and preferred interests, with very little strategic purpose.

111.    After the untimely, confusing and chaotic departure of Stacey Cryer, Bryan Lowery, Diane Curry, Alan Flora, Kristen McMenomey and other effective high-ranking County officials, as well as the demotion of other highly-effective County employees, the COUNTY's Civil Grand Jury 2018-19 (the "GJ-2019") was informed that the public was concerned that the

18

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

CEO was exceeding her authority and that there were no strategic plans for the County's core obligations.

112.    After the failure of high-priority programs for essential services, like Emergency Medical Services and ambulance coverage, the Grand Jury 2018-19 ("CJ-2019") learned that the public was concerned that the CEO was prioritizing preferred and special interests above her obligations to the public at large.

### *2018-2019 Grand Jury*

113.    On May 31, 2019, the GJ-2019 released a report entitled ***WHO RUNS MENDOCINO COUNTY?*** (the "GJ-19 Report").

114.    The GJ-2019 based the GJ-19 Report on interviews with the CEO, her controlled staff, and members of the BoS, both past and present.

115.    The GJ-2019 failed to investigate local agencies within Mendocino County, which would have informed the GJ-2019 about the failures of the COUNTY to establish a truly "… responsive and responsible government."

116.    The GJ-2019 did not interview key COUNTY officials, such as PLAINTIFFS and other demoted County employees, who could have informed the Grand Jury about significant events and circumstances, which demonstrate the means and methods by which the CEO and her staff divert County resources to preferred, special interests that do not perform and deliver on behalf of the public at large.

117.    The GJ-2019 did not interview key COUNTY officials such as PLAINTIFFS and other demoted County employees who could have informed the Grand Jury about the reasons why there was no strategic planning in place for emergency medical services, ambulance service, central command and control for multi-agency, County-wide emergency responses, the replacement of equipment determined antiquated in 2007 and "in imminent danger of

19

permanent failure….” and other “public safety, health, economic, environmental and other needs of [the] communities….”

118.    The GJ-2019 did not interview key COUNTY officials, such as PLAINTIFFS who could have informed the Grand Jury about the reasons why crucial public safety and health programs were not prioritized and completed.

119.    However, despite not interviewing the appropriate personnel; the GJ-2019 found that “that the BoS has failed to establish and publish strategic county-wide policies with effective long term goals that address county-wide issues of public safety, health, economic, environmental and other needs of our communities, as it is charged to do. Rather, the BOS reacts to crises as they arise.”

120.    The GJ-2019 found that “it often appears that the CEO is providing leadership that has been abdicated by the BoS.”

121.    The GJ-19 Report also found F1: “There is no published long term county-wide strategic planning by the BoS, e.g., fire response, homelessness, cannabis, housing and economic development.”

122.    The GJ-19 Report document the fact that:  “[t]he Assistant CEO position is funded, but unfilled.”

123.    The GJ-19 Report also found F3: “The BOS does not adequately track directives given to the CEO. The current list of directives has inadequate status and descriptors and there are no timelines or milestones for completion.”

124.    The GJ-19 Report also found F4: “The CEO Report does not include substantive department updates, e.g. new jail addition, Sheriff overtime, BOS directive status, departmental statistics and major road project status.”

*2019-2020 Grand Jury*

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

125.    With respect to the BoS' failure to establish policies, the Mendocino County Civil Grand Jury 2019-20 ("GJ-2020") released a Continuity Report on March 2, 2020 ("GJ-20 C Report").

126.    The GJ-20 C Report found, among other failures to address past findings and recommendations, that the BoS had still not established and prioritized strategic planning and goals.

127.    The GJ-2020 C Report was silent on the CEO's role in the failure to provide the BoS with operating materials sufficient for the BoS to formulate, establish, prioritize and execute strategic plans and monitor the CEO's adherence to their goals and objectives.

## EMERGENCY COMMUNICATIONS SYSTEMS

128.    On June 3, 2020, the GJ-2020 released a report entitled *THE EMERGENCY COMMUNICATIONS SYSTEMS INMENDOCINO COUNTY, Protecting Life, Health, Safety and Welfare.*  ("CJ-20 ECS Report").

129.    The CJ-20 ECS Report reviewed two previous reports ("GJ-2007 ECS Reports") focused-on the County's ECS.  The GJ-2007 ECS Reports contained the following findings: 1) the current ECS is complex and in imminent danger or permanent failure and 2) the "vaults," which house the equipment, are "old and have significant structural problems resulting in leaks."

130.    The CJ-20 ECS Report also found that during the Redwood Complex Fire in 2017 and Mendocino Complex Fire in 2018 the Emergency Communication System (ECS) experienced an exponential rise in failures, which means any given area is completely without communications. The outages affect up-to twenty-four (24) County, state and federal departments and most severely first-responders.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

131.    PLAINTIFFS, Ms. SHEPPARD and Ms. HOWE along with Dr. Pace (who resigned right after Ms. HOWE's compelled termination) were on the cusp of resolving the decade-old ECS tragedy waiting to happen and establishing the central command control center for LEMSA and ECS at Howard Forest.

132.    Part of the EMS/EMC tragedy waiting to happen was the failure of DEFENDANTS to manage ambulance service such that the COUNTY was without ambulance service when the Sonoma County fires forced the diversion of all ambulance resources to Sonoma County. (*See* EMC/EMS Ambulances, below.)

### *Initiative to Remove Flavored Tobacco Products*

133.    The COUNTY failed to update its tobacco ordinance for such a long time that up to August 2018, the COUNTY was still not in compliance with State law by not changing the legal-age for tobacco purchases from eighteen (18) to twenty-one (21).  As of the drafting of this Complaint, the County is still out of compliance with State law, mainly because HOWE was terminated and SHEPPARD was investigated, demoted and underutilized.

134.    Under HOWE's leadership, Ms. SHEPPARD with revising the COUNTY's seriously-out-of date Tobacco regulations and bringing the COUNTY  into compliance with State Law.

135.    In or around August 2018, SHEPPARD adopted tobacco-ordinance language for an ordinance update or Tobacco Retail License Ordinance ("TRLO").  The language had been approved by the State Attorneys and was circulated to the HHSA Executive Committee in the form of a Board Agenda Summary so that it could be approved by the full HHSA Advisory Committee for inclusion on the BoS Agenda and adoption, if passed.

136.    The revision was funded by a grant from the Public Health Department of the State of California.  One of the core public-policy grant objectives and requirements for the State Public Health Tobacco grant are Key Informant Interviews ("KII") with elected officials.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

137.    From about August 2018 to February 2020, SHEPPARD and/or her staff met with Tobacco Prevention Coalition (the "Coalition") members on a monthly basis to develop a strategy to advocate for the adoption of the TRLO and the Flavor Ban in all four cities and the County.

138.    During this period there was little agreement on how to implement the TRLO because of competing interests between city and county vendors.

139.    During this period, Ms. SHEPPARD and/or her staff (designee) attended events, such as the Mendocino Economic Development Corporation's Open House or the social Chili cook-off.  Often Supervisors would attend the same functions and Ms. SHEPPARD would take the opportunity to discuss matters of public concern, like the TRLO.

140.    During MEDC's open house, Ms. SHEPPARD approached Supervisor Williams and asked him if he would be a candidate for a KII.  Supervisor Williams was not aware of the project and said that he would research the issue.

141.    Sometime in early 2019, contrary to the grant objectives and requirements, TMC prohibited Public Health staff from speaking with Supervisors about the TRLO.

142.    In or around April 2019, Public Health staff conducted a normal and customary public-outreach meeting in Laytonville, CA.  The particular issue was youth vaping.  One of the attendees asked how the community could help.  The PH staff member instructed the person to reach out to his or her Supervisor.  Supervisor Hascheck spoke about his attempts to obtain information about the TRLO and Flavor Ban initiatives, but he could not get information.

143.    Strangely, TMC re-enforced the prohibition that Public Health staff working on the TRLO and Flavor ban could not speak with Supervisors.

144.    In the Summer of 2019, in an effort to move forward a portion of the TRLO in the form of a Flavor Ban, SHEPPARD worked diligently by identifying an area of common ground

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

between the city and county vendors for passage of a portion of the TRLO; to prohibit access to flavored-tobacco vaping products to children.

145.    As an initial step, Ms. SHEPPARD arranged a lunch with the Mayors of each City and a member of the BoS to pass the Flavor ban portion of the TRLO.  When apprised of the progress and buy-in by the Mayor, BoS representative, and the upcoming lunch to discuss the details, TMC prohibited Ms. SHEPPARD from completing the strategic plan to organize the Mayors and demanded that she cancel the event.

146.    During the period of no progress and at the monthly meetings, SHEPPARD had to constantly make excuses to Coalition members for TMC and her unwillingness to adopt the Coalition's work and compromise so that all County and City jurisdictions were under the same ordinance so that children and youth could not gain access to flavored tobacco products; especially vaping products.  TMC wanted all aspects of the TRLO adopted even though there was only secure, wide-spread agreement for the Flavor Ban.

147.    At each monthly meeting, Coalition members would ask why there has been no progress getting the TRLO, Flavor Ban, or both on the BoS Agenda for consideration, voting and approval.

148.    The Coalition members grew increasingly frustrated with the COUNTY's  inability to get the TRLO and or the Flavor Ban before the BoS.  Members began to leave the Coalition explaining the lack of process, progress and accountability.  Remaining members threatened departure if there was no progress.

149.    At each monthly meeting SHEPPARD and/or her Tobacco Program Staff, informed the Coalition members of conversations with TMC and elected officials such as the Mayor and City Manager of Ukiah and other Mayors.

150.    After the conclusion of the monthly meetings, SHEPPARD would socialize with

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Community Members and discuss matters of public concern.  Similar to the findings in the GJ-19 Report, Coalition Members expressed concern about the priority and management of the COUNTY.

151.    After many of these meetings, SHEPPARD made many statements about the fact that TMC is not able to engage in formal strategic planning and provide responsive feedback, in a timely manner, so HHSA could move the TRLO and other projects forward.

152.    TMC blocked progress for no stated reason, and interfered with the progress of the Coalition.

153.    Ms. SHEPPARD eventually received the third-party email and requested from TMC permission to reach-out to the Supervisor, but TMC excluded Ms. SHEPPARD and her staff from any discussion with the Supervisor.

154.    Another attempt was made to update the Board Agenda Summary but at the last minute, TMC delegated authority to Beckie Emory, who had never been a part of the TRLO and Flavor Ban project, having worked only in social services and having no experience with the subject matter.

155.    Ms. Emory made sure that the Board Agenda Summary had changes, which could not be completed under the process for the Board Agenda Summary policy.

156.    On or about March 26, 2020, Ms. SHEPPARD suffered an adverse action in the form of an unlawful two (2) position demotion without cause or explanation.  Ms. SHEPPARD had to hire an attorney to counsel her to restore at least one level, which constitutes an adverse-employment action.

157.    Again TMC reiterated the unlawful prohibition of HHSA staff speaking with Supervisors for KIIs and their input, which would ultimately be required to approve the measure.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

158.    In the September 2019 Coalition meeting, attended by Jay McCuneren, a guest from Sonoma County who presented, the Coalition Members again focused their questions about progress with the TRLO and Flavor Ban.  The committed and supportive Vice Chair of the Coalition also serves as an active member of the HHSA Advisory Committee and is dedicated to the health and safety of the community.

159.    Ms. SHEPPARD responded more directly to the Coalition and explained that she was not permitted to speak with Supervisors.  Further, she reiterated the fact TMC is not able to engage in formal strategic planning and provide responsive feedback, in a timely manner, so HHSA could move the TRLO and other projects forward.  Ms. SHEPPARD explained her own frustration about the lack of leadership since Ms. HOWE's compelled termination and explained that TMC did not implement the terms of the "Turn the Ship Around" ("TSA"), "Leadership at All Levels" ("LAL"), and "High Performing Organizations" ("HPO") or have effective policies.

160.    To provide a working strategy for the Coalition, Ms. SHEPPARD explained to the Coalition members that they had to directly interface with the Supervisors and other COUNTY officials.

161.    To Ms. SHEPPARD, it became clear that TMC had ulterior motives with respect to the TRLO and Flavor Ban and was unwilling to provide a reasonable pathway to get this Ordinance before the Board of Supervisors.

162.    The sham Discrimination Investigation (below) conducted against Ms. SHEPPARD started just after this September 2019 meeting.

163.    There was very little progress on the TRLO and flavor ban until early February 2020, when a third-party community organization inquired with PH staff about how a Supervisor could obtain the status of the TRLO and Flavor Ban.

***Emergency Medical and Communication Services; Ambulances***

164.    Unbeknownst to HOWE or SHEPPARD, the Emergency Medical Communication ("EMC") facilities, also known as "vaults," and EMC services intertwined with ambulance service have been neglected for years.  Based upon the GJ-20 C Report some of the neglect dates to 2007.

165.    Within the Public Health Emergency Preparedness Program, Public Health (HHSA) has responsibility to lead, coordinate, supply and organize healthcare partners throughout the County for a wide variety of emergency responses.   Public Health leads discussions, planning, table-top drills, live exercises, analysis and follow-up to refine the effectiveness of plans and the execution of those plans.

166.    One of Ms. HOWE's performance measures was to "test and drill PH staff" in emergency responses.

167.    LEMSA is the Local Emergency Medical Service Agency mandated by the State, but established by a county, city or an association of the same.  It is the go-to agency for the delivery of Emergency Medical Services, including ambulance and other emergency coordination, needed during any sort of local or regional emergency.

168.    LEMSA's purpose and charge is to plan, implement, evaluate (train), and improve the delivery of emergency medical services, which, under an emergency, requires an extremely well-coordinated response from all public agencies commanded from a pre-established command center.

169.    There is a significant need for significant coordination, prioritization and communication between the office of the CEO for the COUNTY and LEMSA, especially since it is based in Sonoma County, for control and deployment of EMS resources and equipment and, responsibility for the ECS vaults and equipment.  There is a significant power struggle

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

between the CEO and LEMSA, which hinders responsive and responsible solutions. (*See* Ambulance EOA.*)

170. Without a functioning EMC it is nearly impossible to coordinate an effective county-wide response.

171. In early 2019, TMC assigned additional significant duties to Ms. SHEPPARD that included HHSA's coordination of LEMSA service for the COUNTY. Shortly thereafter on March 24, 2019, Ms. SHEPPARD was promoted to Senior Program Manager.

172. The tragic fire seasons in 2017 and 2018, heightened public and government concern for the upcoming 2019 fire season.

173. In late April of 2019, Ms. Howe learned that PG&E implemented a plan for the upcoming fire season to shut-off power during high-risk fire conditions.

174. On May 15, 2019, Public Health Emergency Preparedness Program (PHEPP) was hosting an annual testing and training day for its healthcare partner organizations responsible for emergency response ("ER Partners").

175. Ms. HOWE organized and informed ER Partners about PG&E's upcoming and certain Public Safety Power Shutdown (PSPS).

176. Certain community groups were concerned about residents who have electricity-dependent medical conditions. ER Partners and residents needed to know the location of pre-determined evacuation centers to deliver EMS for this patient population.

177. Ms. HOWE worked with the Office of Emergency Services to secure a PG&E spokesperson to give a presentation on the PSPS so that the COUNTY and the ER partners could develop coordination and communication plans for the PSPS.

178. During the lunch break in the annual testing and training day, Ms. HOWE made certain to inform the residents and ER Partners about a very important missing piece of their

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

emergency plan; namely, the transportation of clients to the evacuation centers.  Ms. HOWE informed the residents and ER Partners that LEMSA was struggling with ambulance issues that jeopardized emergency-related transportation for every resident of the COUNTY.

179.    Ms. HOWE informed the residents and ER Partners that there was a very high probability that ambulance service would not be available; because CEO Carmel Angelo ("Ms. Angelo") by and through TMC had disrupted a flexible, multi-company ambulance system to divert the contract to a favored provider.  TMC and Ms. Angelo released an Exclusive Operating Area request for proposal for ambulance services.

180.    Ms. SHEPPARD, as the LEMSA liaison, had built very good relationship with the ambulance companies as mission-critical ER partners.  TMC expanded Ms. SHEPPARD's role by delegating to her the responsibility of serving as the primary contact and liaison between the County and the contracted Personnel to develop and, evaluate and award RFP for EAO; serve as daily liaison with  LEMSA providing vision and support; Research and write By-Lays for the BoS EMCC  ( Emergency Medical Care  Committee ); Coordinate and staff  RFP(Request for Proposals) meetings for Exclusive Operating Area RFP; represent County in EMS meetings with LEMSA and EMS providers; attend training and conferences and bring information and best practice back for review and implementation.

181.    Ms. SHEPPARD coordinated the receipt, review and recommendation for the best applicant provider.  However, in hindsight and after the failure of the EOA bid process, it was clear that the decision had already been made and the written policy was just a cover for DEFENDANT's pre-determined and unlawful awarding of taxpayer dollars to favored entities.

182.    In anticipation of the awarding the EOA, those ambulance companies that were operating in the Ukiah Valley initiated plans to shut-down because they knew with near certainty who the 'chosen' provider would be.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

183.    Ms. SHEPPARD received an email that confirmed that Faulk ambulance service was indeed relocating.

184.    Additionally, during her lunch hour discussions with residents and ER Partners, Ms. HOWE informed them that once the evacuation site(s) is identified, there are four State-supplied generators for emergency purposes, in storage under the Emergency Preparedness Program, at the COUNTY's Public Health Office at 1120 South Dora Street in Ukiah, CA.

185.    When the presentation commenced Ms. HOWE informed the residents that no site had been selected, but electricity-dependent patients/clients and their caretakers are well-informed of the location of the Regional Center, which is also serviced by public transportation.

186.    A few of the residents and ER Partners raised the challenge of moving generators in an emergency and would they be deployed before power shut-downs.  Ms. HOWE informed the residents and ER Partners that she would develop an email list so that she could coordinate the communication and inform all of the ER Partners about the COUNTY's final plans with respect to the evacuation centers and power for electricity-dependent clients.

187.    The events of disrupting the delivery of ambulance services through the EAO combined with the emergency conditions created by the unexpected Sonoma Fires left the residents of the COUNTY without ambulance service, an issue of grave concern to all residents.

188.    As a consequence of Ms. HOWE's compelled termination and the demotion of Ms. SHEPPARD, the EMS and EMC deficiencies that were identified in 2007 have still not been corrected as the GJ-20 EMS Report confirms.

189.    Ms. HOWE and Ms. SHEPPARD along with Dr. Pace were leading, mentoring and encouraging the Public Health staff to deliver responsive and responsible programs and services.

190.    Rather than receiving the rewards for their efforts, Ms. SHEPPARD and Ms. HOWE ,

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

respectively, were compelled to sign a termination, investigated, demoted and under-utilized and compelled to resign before becoming the next target for career destruction, like previously cancelled COUNTY officials.

191.    In place of the team of Ms. HOWE, Ms .SHEPPARD, Dr. Pace and the Public Health team, COUNTY has installed Heidi Corrado, the preferred lesbian to preserve and protect the "good ol' white -lesbian club."

192.    Upon information and belief, Ms. Corrado's personnel file should contain a performance review with seventy-five pages of supporting material that Heidi Corrado should not pass her probationary period, because she made false statements, created false records and misrepresented her authority to State officials.  Ms. Corrado is now the LEMSA liaison or similar and has responsibility for EMS and ECS, which has still not been resolved.

### Compelled Speech—Heidi Corrado

193.    Throughout her employment with the COUNTY, Ms. SHEPPARD has demonstrated that she believes in Leadership Development, team building and support, such that she was able to accumulate over seventy-five pages of material to support her conclusion, supported by Ms. HOWE, that Ms. Corrado did not pass her probationary period.

194.    HHSA is staffed by people similar to Ms. Corrado who are not qualified for their respective positions.

195.    DEFENDANTS TMC and SCHURTZ demanded that Ms. HOWE and Ms. SHEPPARD change the data and information in Ms. Corrado's performance review and approve the completion of her probationary period.

196.    Ms. HOWE and Ms. SHEPPARD stated that Ms. Corrado was not responsive and productive enough to handle grant budgetary and contract compliance; supervision and leadership, or the willingness to be supervised by an African American person; however, TMC

31

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

and SCHURTZ demanded that they approve, against their rights against compelled speech, Ms. Corrado's satisfactory completion of her probationary period.

197.    In November of 2018, Ms. HOWE, MS. SHEPPARD and Jane Doe 1 participated on an interview panel[1] for the position of Program Administrator.

198.    Ms. Corrado was one of only two (2) applicants and was hired in December of 2018 as a Program Administrator for the Opioid Program in the Community Wellness Unit.  Since Jane Doe 1 was going to be her supervisor, her input was given significant weight.

199.    Ms. SHEPPARD replaced Jane Doe 1 as Corrado's supervisor.

200.    Ms. Corrado was responsible for grant budget planning and tracking, contract management and compliance and with correctly and timely submitting progress and compliance reports to the State of California and other funding sources.  She was also responsible for writing grants and notifying leadership of funding opportunities.

201.    Upon information and belief, Ms. Corrado did not disclose to anyone with HHSA that the first grant-submission deadline was provided to her on or about December 28, 2018 and due on January 18, 2019.  Ms. Corrado failed to inform Ms. HOWE or MS. SHEPPARD.

202.    Ms. Corrado waited until the very last minute on January 15, 2019, to inform Jane Doe 1, Ms. SHEPPARD or Ms. HOWE about very important deadline.  With a great deal of resources and emergency work, HHSA was able to obtain the funds for a very important position to serve the Coast Community of the COUNTY.

203.    The second deadline was for a Medication Assisted Treatment Funding announcement that Ms. Corrado received on January 18, 2019 and was due February 15, 2019.  Ms. Corrado submitted an application with a budget that included a line item for the Sheriff's department.

204.    Ms. Corrado was told numerous times not to include the budget line items for the

_____

[1]    This process was skipped by CONVERY when she demanded that Ms. MORGAN falsify the interview notes and questionnaire on behalf of the pre-selected candidate.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Sheriff because it was not proper. Consistent with her pattern of insubordination, she included the item. When the Application was presented to TMC, she refused to sign because HHSA cannot or did not agree to include a line-item for a sister Agency.

205. Due to her insubordination, the Application was returned and never presented to and approved by the BoS.

206. Because Ms. Corrado could not follow simple instructions and engaged in dilatory insubordination she created an emergency situation by which HHSA and the BoS had to retroactively approve the contract so that the funds, which were very significant could be spent by December 31, 2019, but in a wasteful manner. The contract to deliver opioid services was retroactively approved well into the grant term.

207. In one more example of a history of continued insubordination and failure to perform, Ms. Corrado was supposed to submit an Office of Traffic Safety quarterly report due on January 30, 2019, under the OTS grant. She has support to help with the time she was not employed with the unit and was only required to ensure the report was completed and submitted.

208. On February 5, 2019, Ms. Corrado was not aware that she was responsible for the OTS grant and she claimed that she had not been provided any information about it. However on January 8, 2019, she had actually forward an email to Ms. SHEPPARD that contained a copy of the budget, which demonstrated that she was either not aware of her work flow or she lacked candor.

209. On or about April 30, 2019, Ms. SHEPPARD and Ms. HOWE met to discuss Ms. Corrado's insubordination, failure to manage her workflow, inability to support her team, and a persistent failure to perform.

210. Within a week or two of the April 30th meeting, Ms. HOWE informed SCHURTZ that

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Ms. Corrado was both underperforming and acting insubordinate when attempts to discuss her performance were initiated.   Per County policy, all disciplinary staff situations are to be conducted jointly with the supervisor/manager and Human Resources.  Following HHSA protocol, Ms. HOWE and Ms. SHEPPARD sent the documentation to Mr. SCHURTZ, the HHSA Human Resources Liaison.

211.    Ms. Corrado did not satisfactorily complete her probation period.

212.    Rather than addressing Ms. Corrado's insubordination, misrepresentations made to State Officials, and her failure to comply with State grant-auditing requirements; SCHURTZ informed Ms. HOWE and Ms. SHEPPARD that there would be no action against Ms Corrado.  He told Ms. HOWE that she had to pass Ms. Corrado, in defiance of well-established written policies and procedures and the relevant criteria.

213.    Ms. HOWE and Ms. SHEPPARD understood that Ms. Corrado's misrepresentations to the State could jeopardize the subject grant, as well as future grants or the COUNTY would otherwise be subject to time-consuming and disrupting State audits of Ms. Corrado's grant programs and even other COUNTY programs and grants.

214.    Ms. HOWE informed TMC about the situation and requested that TMC intervene and apply normal, customary and civil-service probationary rules and reassign or otherwise reduce or reassign Ms. Corrado.

215.    TMC and SCHURTZ refused to apply the normal and customary disciplinary rules for employees in their probationary period and informed Ms. HOWE to do nothing and stop raising and discussing the issue and that Ms. Corrado, a lesbian, was protected.

216.    On or about May 20, 2019, Ms. SHEPPARD presented to Ms. Corrado her performance evaluation with the marks Ms. SHEPPARD and Ms. HOWE accurately reflected her sub-par performance.  Some of her review identified the areas that were not satisfactory; including, No

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Leadership or supervision of Staff; complaints from staff regarding her arrogance and lack of support;  consistent Insubordination in Public and otherwise, such as questioning the Medical Doctor about Opioid and other relevant issues to the Opioid Program and Medication Assisted Treatment; Inability to manage grants, timely submission of Contract Request Tickets ( CRT), Board Agenda Summaries (BAS) and other documentation needed to get approval for contracts and funding;  Unwillingness to accept supervision from an African American; making easily refutable assertions about timelines, due dates and responsibilities; and Making false statements (e.g.. Misrepresenting her qualification, falsely claiming she was a member of the American Medical Association in an email when she shared an article from the  AMA).

217.    Ms. SHEPPARD provided Ms. Corrado's performance review to SCHURTZ shortly after her review with Ms. Corrado.

218.    Conduct such as Ms. Corrado's misrepresentations to State Officials jeopardizes state and federal funding and implicates state and federal laws and regulations with penalties and the prospect for expensive representation.

219.    On May 24, 2019, Ms. HOWE was compelled to sign her forced termination effective May 31, 2019; after she refused to comply with DEFENDANTS' TMC's and SCHURTZ' demand for her compelled speech by her signature.  She was terminated for her refusal to approve a satisfactory performance review for Ms. Corrado's and her speaking publicly about the failure of DEFENDANTS to engage in meaningful strategic planning and the negative impact their failures had for disrupting the EMS ambulance services and other programs.

220.    On or about May 30, 2019, Dr. Pace tendered his resignation.

### Compelled Speech—SHARON CONVERY

221.    Concurrent with the events and circumstances relating to Ms. Corrado another

subordinate of TMC, SHARON CONVERY attempted to obtain a signature on a required COUNTY document against the employee's will, ethics, and good conscience.

222. Ms. CONVERY is Ms. MORGAN's immediate supervisor. Ms. CONVERY is herself an R.N.

223. Both Ms. CONVERY and Ms. MORGAN have heightened professional responsibilities arising from their State-issued licenses. Ms. MORGAN's State license in Public Health carries additional responsibilities delivering health services to foster children.

224. Ms. MORGAN is under strict confidentiality provision about the nature of her clients and the specifics of their cases; however, she has spoken up against the backlog of case histories and the failure of TMC and CONVERY to plan and execute those plans.

225. The failure to develop strategic plans damages Ms. MORGAN's patients because without medical histories, a child cannot receive medical services. Some services are urgently needed.

226. At the end of 2019 and early 2020, HHSA announced an internal position under the Civil Service System rules and the HHSA Ordinance. Given Ms. MORGAN's skills, expertise and strong performance, Ms. CONVERY invited Ms. MORGAN to participate on the interview panel for the position.

227. The applicant was Ms. Hashimoto. Ms. MORGAN participated on the interview panel, which she had done previously. The panel was on January 30, 2020, with Sharon CONVERY and Ms. MORGAN.

228. Prior to the interview, Ms. MORGAN was not provided any normal and customary documents and data for a similar interview. She did not receive the applicant's resume, personnel data, information, current roles and responsibilities or any performance data.

229. Ms. MORGAN knew something was strange when she arrived at the interview and Ms.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

CONVERY asked if she gave Ms. MORGAN the packet containing interview questions and resume from the HR Department. Ms. MORGAN had no time to review the applicant's resume, application and personnel file. Ms. CONVERY informed Ms. MORGAN and the applicant that there was no need to perform the interview. Ms. CONVERY informed Ms. MORGAN that management had already decided to promote Ms. Hashimoto instead of conducting interviews, contrary to written HR policies and the Civil Service System.

230.    Ms. MORGAN was told that there was no need to follow the HR and department policies requiring the completion of the interview questionnaire that HR provided. The questionnaire would normally allow decision makers to compare and contrast interview-questionnaire entries for different applicants to determine the candidate who could best serve in the position and the public at large.

231.    The COUNTY, TMC's, and SCHURTZ's ratified Ms. CONVERY's conduct because they knew of the conduct, ratified, and condoned it, and failed to discipline CONVERY.

232.    Ms. CONVERY also coached the applicant in the language to use with HR that would maximize the applicant's salary with the promotion because the applicant was a favored subject. Ms. CONVERY informed Ms. MORGAN, in a very awkward exchange, that unfortunately for Ms. MORGAN she was not so informed/coached as to how to maximize her salary. The use of public funds to curry favor and create malleable employees is a common characteristic, policy and practices for the COUNTY and DEFENDANTS. The fraudulent process allows Managing Agents to leverage the employees for their desired outcomes or threaten them with reprisal, demotion, termination, or destruction.

233.    On January 30, 2020, three days after Ms. HOWE filed her SAGC, Ms. MORGAN contacted a personnel manager, Denise Bartolomei. Ms. MORGAN informed Ms. Bartolomei that she was shocked about the interview process and the ratification of Ms. CONVERY's

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

conduct.

234.    In order to complete the applicant's file, Ms. CONVERY repeatedly requested that Ms. MORGAN falsify a document, answering the questionnaire that the applicant should have answered herself in the interview process.  On at least three explicit occasions Ms. CONVERY pressured Ms. MORGAN to complete the answer with above-satisfactory responses so the selection would have underlying support.  Ms. CONVERY informed Ms. MORGAN that the applicant would not get her raise and promotion until the file was complete.

235.    After the requests became demands, Ms. MORGAN contacted her union representative, Patrick Hickey, SEIU.  He helped Ms. MORGAN file a formal union grievance.

236.    At one point, Ms. MORGAN approached Ms. CONVERY to obtain data from the Children's Hospital database to complete work on behalf of a foster-child client.  Ms. CONVERY, who had a medical and professional duty to obtain the information, only available to her demanded that Ms. MORGAN first complete the HR questionnaire, which amazed and devastated Ms. MORGAN

237.    Ms. MORGAN contacted Ms. CONVERY and informed her that she would not comply with her demand to complete the questionnaire on the applicant's behalf, which could be cause to terminate Ms. MORGAN for violation of the State's and COUNTY's misconduct policies. Ms. CONVERY was demanding Ms. MORGAN jeopardize very important state and federal benefits and licensure, let alone professional discipline by the appropriate boards.

238.    Nearly three months later, the COUNTY had still not resolved Ms. MORGAN's complaint, had still not disciplined Ms. CONVERY, and refused to select a new supervisor for Ms. MORGAN, who could not trust Ms. CONVERY.

239.    Ms. MORGAN experienced severe emotional distress from the fraudulent conduct and the failure of HHSA to correct itself and deliver responsive and responsible services.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

240. TMC, who demanded that Ms. SHEPPARD and Ms. HOWE sign a document with false statements and compelled Ms. HOWE to sign a termination sentence that TMC drafted and with which Ms. HOWE did not agree, failed to discipline Ms. CONVERY.

241. In a letter to Ms. MORGAN, TMC admitted that there are no established supervisorial policies for the COUNTY against TMC's own and CONVERY's conduct in demanding employees engage in compelled speech, with viewpoint discrimination and with the fraudulent goal to falsify documents. Defendant TMC admitted that training for this core, irrefutable and widely-known prohibition against fraud and undue influence was not existent and that HR would be establishing a widespread training.

242. DEFENDANTS and Ms. CONVERY, in particular, put Ms. MORGAN in a very stressful position and were indifferent to their violations of well-established constitutional rights and the negative professional impact compliance with the fraud and undue influence would have on Ms. MORGAN's career.

### Termination, Retaliation & Adverse Employment Actions

243. Upon learning of Ms. HOWE's termination; Dr. Pace immediately resigned in open disgust with Ms. HOWE's unethical, illegal and compelled termination.

244. Related to his resignation, Dr. Pace explained that he resigned because Ms. HOWE was no longer in her position and the manner and method by which she was terminated and the messaging of the termination that contradicted the facts. He did not want to become collateral damage because he had an exceptional medical reputation throughout California and elsewhere and a very strong, professional relationship with Ms. HOWE.

245. Shortly after the Public Health Emergency Planning Program (PHEPP) held on May 15, 2019, TMC texted Ms. HOWE three times after the May 15, 2019 meeting. (*See* EMC/EMS above.)

246. First, TMC inquired about the list of attendees of the PHEPP testing and training program, which Ms. HOWE provided. Second, TMC inquired about the name of the PG&E spokesperson, which Ms. HOWE provided. Third, TMC inquired as to whether or not Ms. HOWE "committed county resources without authorization" to which Ms. HOWE replied: "absolutely not from Public Health!"

247. Ms. HOWE planned to discuss and obtain buy-in from TMC for the PHEPP plan for electricity-dependent residents at their next regularly-scheduled meeting on May 24, 2019.

248. However, at their next regularly-scheduled meeting Friday, May 24, 2019, TMC and the then current Director of Human Resources, Heidi Dunham, worked for their own personal interests to terminate Ms. HOWE without any due process, adherence to the terms of TSA, LAL and HPO, Civil Service System, the HHSA Ordinance and other written policies and procedures.

249. TMC, with a one sentence resignation letter in hand completely lacking any normal, customary, and negotiated terms, with support from Heidi Dunham entered Ms. HOWE's office and cornered her inside with no open space. TMC showed a very aggressive stance and handed Ms. HOWE the piece of paper.

250. The resignation letter forced upon Ms. HOWE was not reviewed by the COUNTY Counsel, but was a product of TMC, Dunham or one or more of DOES 4-70, inclusive.

251. The method, manner, timing, cause-for, and process to compel Ms. HOWE's resignation was not reviewed, authorized or support by COUNTY Counsel.

252. TMC stated emphatically as she assumed her position with Dunham at her side, "you are an at-will employee and we no longer need your services."

253. Ms. HOWE was never given notice or warning about the compelled termination, the authority for it or an explanation for not following the process outlined in the HHSA Ordinance

or the Civil Service System.

254.    Ms. HOWE was repeatedly informed by DEFENDANTS through Leadership Mendocino, AMT, Supervisorial Training and elsewhere that employees would not be terminated without cause, which the COUNTY documents in its HPO materials  and the materials from TSA and LAL.

255.    TMC stated that Ms. HOWE would be terminated if she did not sign her name to the compelled speech.  TMC told Ms. HOWE that she had five (5) minutes to make her decision.

256.    Ms. HOWE asked if she could have an attorney review the letter and situation.  TMC reiterated that Ms. HOWE had five (5) minutes to sign her name to the compelled speech. TMC stated that HHSA's planning process was just fine and if it decided to have one ambulance company, then that was none of Ms. HOWE's business.

257.    As Ms. HOWE considered these events, TMC engaged in further unlawful conduct, threatening the use of force against Ms. HOWE, stating that a Sheriff was on-call on the HHSA campus and he would escort Ms. HOWE, by force if necessary, if she refused to leave.

258.    TMC demanded again that Ms. HOWE sign her name to the compelled speech.

259.    Ms. HOWE had never expressed any menacing or threatening conduct toward any COUNTY employee, TMC, or Dunham.

260.    In disbelief, under duress and under threats by TMC and Heidi Dunham, Ms. HOWE did not act freely, but was compelled to sign her name to compelled speech.

261.    DEFENDANTS forced Ms. HOWE to resign because she absorbed and implemented TSA, LAL, and HPO which earned her the trust and utmost respect of her staff, peers, and the public.  Ms. HOWE's personal and team success stands in stark contrast to the then soon-to-be released GJ-19 Report demonstrating the failure of the CEO and BoS to implement strategic planning.  The failures were recognized by the public and documented in the GJ-19 Report that

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

was released May 31, 2019, seven (7) days after the ambush, which was the effective date of the compelled termination.

### TRO—Two, Both Malicious Prosecutions & Abuse of Power

262.    Ms. HOWE was still employed from May 24, 2019 to May 31, 2019, the end of the pay cycle.  When she was processing the trauma of the compelled termination, she realized she had to try to get a hearing to clear her name.

263.    On May 28th and 29th, 2019, TMC held HHSA/PH staff meetings at which she falsely claimed that Ms. HOWE voluntarily and happily resigned.  She wanted to let the Public Health staff knew that she wanted to "say good-byes" but events prevented her.

264.    TMC misled the staff about Ms. HOWE's wrongful termination.  PH staff at the meeting expressed skepticism about TMC's claim that Ms. HOWE resigned voluntarily.

265.    A very good portion of the Public Health staff knew that Ms. HOWE did not voluntarily resign.  Dr. Pace was one such person and he openly stated that one of his reasons for his resignation was the false statements and reports TMC made.

266.    After receiving information about TMC's false statements and reports that were untruthful, Ms. HOWE started to investigate the reasons for her compelled termination.

267.    The news traveled fast and the relevant public was discussing Ms. HOWE's now public compelled termination.  There were a significant number of HHSA stakeholders that were suddenly without Ms. HOWE and soon would be without Dr. Pace, a critical and mandated Public Health and Emergency position.

268.    Ms. HOWE sent a text message to TMC asking about the reason for her termination, since Ms. HOWE's carefully crafted career had been negatively impacted for no apparent cause and without due process.   Ms. HOWE engaged in protected activity by seeking a hearing on the basis for the termination.

269.    In one of her text messages to TMC, Ms. HOWE used the term "dis-ease," and the fact that TMC, along with one or more of DOES 4-70, inclusive were going to be at "dis-ease" for having implemented the malicious compelled termination.

270.    The word "Dis-ease," intentionally written with the '-'explains that mental and emotional stress can manifest in physical symptoms and illness increasing the possibility of harm from working in a stressful environment; namely the environment TMC and DEFENDANTS created.

271.    TMC, as the head of HHSA, knew that the term "dis-ease" was widely used in HHSA, but attempted to argue in her testimony for a workplace violence TRO that she was ignorant of the phrase and testified that it was not a term in general use at HHSA.

272.    A person other than Ms. SHEPPARD provided to Ms. HOWE a picture of the word "dis-ease" on a whiteboard in the HHSA offices.

273.    However, TMC expressed an irrational fear of Ms. HOWE's use of the term "dis-ease" in the text messages and in direct retaliation for HOWE's protected activities, attempted to destroy Ms. HOWE's career by filing for a restraining order.

274.    DEFENDANTS knew that the release of the revealing GJ-19 Report was just days away.

275.    Since DEFENDANTS failed to obtain approval by COUNTY Counsel prior to engaging in the retaliatory termination of HOWE, after-the-fact DEFENDANTS sought the assistance of Ms. Elliot, COUNTY Counsel and one or more of Does 4-70, inclusive.

276.    While Ms. HOWE was seeking a constitutionally protected hearing to clear her name after the defamatory false statements and reports TMC made about Ms. HOWE's termination, the COUNTY by and through its COUNTY counsel was readying not one, but two Temporary Restraining Orders ("TRO"s).

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

277.    One or more of DOES 4-70, inclusive realized that the COUNTY could be held liable for the unlawful termination of HOWE's employment, and upon learning about the above-referenced text messages sought to weaponize them against Ms. HOWE.

278.    In direct retaliation for Ms. HOWE's protected activities, and with intent to harm Ms. HOWE, Ms. Elliot filed, improperly, for a civil harassment restraining order against Ms. HOWE. Under California Code of Civil Procedure § 527.6, "a person who has suffered harassment as defined…" may seek a TRO. The COUNTY was not a proper petitioner and the case was dismissed upon oral motion.

279.    The second application was defective on its face. Under C.C.P. §527.8, an "employer" may seek a TRO if an employee has suffered unlawful violence or a credible threat of violence… that can be reasonably construed to be carried out or to have been carried out at the workplace."

280.    The double filings, which were defective on their face, demonstrate a very clear motive and intent to destroy Ms. HOWE and any attempt she might have to salvage her career.

281.    The COUNTY would not dismiss the cases even with the obvious defects on the face of the petitions. The CEO and TMC wanted to proceed and would not agree to normal and customary terms.

282.    The TRO hearing started with direct testimony by TMC. TMC alleged that she believed that Ms. HOWE was going to give some sort of disease to her.

283.    TMC testified that she was concerned about consuming food and drink and that she did not want Ms. HOWE knowing where she lived, even though a few months prior Ms. HOWE met TMC at TMC's house to drive together to Sacramento for a meeting.

284.    Upon cross examination, it became apparent that there was no predicate for the applications and the use of the term "dis-ease" was not a threat to TMC. However, TMC did

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

not have clear answers when she was examined about the context of the compelled termination and the source of the letter.

285.    Dr. Pace testified by declaration that he had seen the word "dis-ease" written on a whiteboard in the Public Health building located at 1120 S. Dora Street, after Ms. Howe's termination and it remained there for a considerable period of time after May 24, 2019 up to about June 12th."

286.    The Court realized that TMC was making admissions, so it directed the parties' trial counsel to chambers and suggested strongly a settlement.   Ms. Elliot was *not* trial counsel.

287.    During the settlement process, Ms. Elliot entered the chambers to complain to the judge about the publication of an online article about Ms. HOWE's treatment and the court proceedings.  Ms. Elliot wanted to put a gag clause into the settlement agreement confirming the DEFENDANTS' policy of retaliating against employees who express their First Amendment Rights.

288.    The parties reached a settlement agreement and the case was been dismissed.

289.    Ms. HOWE's performance, age, wisdom, ability to empower, engage and mobilize others, her sexual orientation and progress building a network of COUNTY resources to effect real change were a threat to the existing power structure in TMC, SCHURTZ and one or more of DOES 4-70, inclusive, especially since there was no check and balance in the position of Assistant CEO or the BoS, which was confirmed by the GJ-19 Report and the GJ-20 C Report.

### *TRO—aftermath*

290.    At first, TMC viewed Ms. SHEPPARD as a neutral employee and was supportive of Ms. SHEPPARD's efforts to advance in HHSA, which has seniority priority for new positions and promotions under both civil service rules and COUNTY ordinances.

291.    However, under her irrational fears and culpable state of mind, TMC sought to discover

45

the identity of the person who informed Ms. HOWE about the presence of the term "dis-ease" on the whiteboard and TMC's dissemination of false statements and reports regarding Ms HOWE's compelled termination.

292.    Under her self-induced stress and Ms. HOWE's support for Ms. SHEPPARD, TMC mistakenly viewed Ms. SHEPPARD as the source and advocate for Ms. HOWE and therefore a threat to her.

293.    TMC falsely claimed that Ms. SHEPPARD informed Ms. Howe about the misinformation TMC was spreading about Ms. HOWE's wrongful termination, especially the information about the existence and use of the term "dis-ease" in HHSA that helped Ms. HOWE defeat the second TRO. In fact, it was Julie Beardsley, whose statements and role as a Union Representative TMC later used to defame and demote Ms. SHEPPARD, who actually provided Ms. HOWE with picture s from the Whiteboard.

### Discriminatory Investigation & Failure to Follow HHSA Personnel Ordinance

294.    Now, the Parities, minus Ms. HOWE and a replacement for the Medical Director formerly held by Dr. Pace entered the Summer of 2019.

295.    After HOWE's termination and the fallout, DEFENDANTS, especially TMC were keen on discovering and punishing any person who was identified, rightly or wrongly, with the dissemination of information about the falsehoods TMC spread about the nature of Ms. HOWE's compelled termination.    Ms. HOWE's termination had a very detrimental and disruptive effect on the staff and chilled close, working relationships because they understood that any support for Ms. HOWE would be severely punished.

296.    The staff knew that something bad happened to Ms. HOWE who had created a harmonious, effective organization that was delivering responsive and responsible programs and services and addressing key public-health issues, like EMS/EMC, which were a decade old

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

and as of the GJ-20 EMS Report, still not solved.

297.   Dr. Pace concluded that the unwritten policies were toxic and destructive to one's career, so he resigned effective at the end of his contract June 30, 2019.

298.   Ms. SHEPPARD was very high on the list of targets, but the problem was that Ms. SHEPPARD was not involved with informing Ms. HOWE about the false narrative of her compelled termination, which had very dire consequences.

299.   TMC was starting to isolate Ms. SHEPPARD and restricting her authority in her position.  Ms. SHEPPARD and her staff were prohibited from satisfying the Tobacco Grant objectives of interviewing elected officials, which was subverting the public's goal to reduce access to youth to flavored tobacco products, a prime Public Health matter.

300.   In addition to Ms. Corrado, Ms. SHEPPARD was receiving culturally insensitive feedback from another one of her direct reports.  The failure of DEFENDANTS to enforce the written Civil Service System and HR performance-review policies against Ms. Corrado's insubordination and sub-par performance established unwritten policies that caused disruption and disharmony in the supervision and delivery of Public Health services and programs.  As would become apparent in 2020, the failure to establish the WIC, culturally- competent strategies had a devastating impact on the disproportionately affected  and vulnerable, and underserved,  communities during COVID-19.

301.   One of Ms. SHEPPARD's direct reports was Meredith Reinhard who was having difficulty understanding the difference between a valid Public Health program or service directed at prevention versus an invalid and inappropriate Public Health program and service directed at intervention.   She refused to correct her strategies and approach to her client community.

302.   The programs mandated by Public Health and WIC §5600 *et. seq.* and championed by

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Ms. SHEPPARD were undermined by the unwritten polices and what would evolve into an absurd investigation of Ms. SHEPPARD for discrimination based upon dishonest and uninformed allegations.

303.    WIC § 5600 *et. seq*. specifically mandates the delivery of Public-Health services based upon what appear on the surface as improper discrimination.   However, the purpose of the cultural competent mandate is to discriminate in favor of developing culturally competent strategies to deliver Public-Health programs and services based upon characteristic that would normally be discriminatory if used to deny a person their civil rights..

304.    Ms. SHEPPARD's underserved communities with health disparities and poor Social Detriments of Health were and are, Native American, Latino, Asian, and African American. TMC and one or more of DOES 1-50, inclusive, improperly cited Ms. SHEPPARD's use of nationally recognized and federally supported Socio-ecological model for health prevention policy assessment, development, and execution to accuse her of discrimination.

305.    DEFENDANTS and in particular FENGLER were completely uninformed about the requirements of  WIC §§ 5600 *et. seq*.

306.    Ms. SHEPPARD was implementing evidence-based competency training coupled with more effective resource utilization.

307.    Ms. SHEPPARD directed staff to identify and communicate public-health information and awareness (i.e. needle exchange, tobacco cessation programs, etc.) in forums, meeting and other gatherings at which the target audience is more open to the information.  Target residents were not open to public health information when they were attending social and entertainment events because attendees are interested in activities, which are less healthy.   Attendance by staff at social and entertainment events for Outreach and Education is not productive or a good use of tax payer dollars.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

308.    Ms. SHEPPARD requested that her direct reports identify a community-based group with whom to conduct public-health information and awareness programs and affect policy development versus the County fair and other ineffective methods for Public Health Health-Policy Work.  Additionally, there was no outreach or engagement with event goers because the attendees and residents are not as open, if at all, to health-conscious information.

309.    Conflicts arose with Ms. SHEPPARD because Ms. Reinhard, Ms. FENGLER, and Ms. Corrado did not respect the line between prevention and intervention, which caused disharmony and disruption in the workplace.  Ms. SHEPPARD's resource grants provide for prevention programs, not intervention programs, but Ms. Reinhard and others completely ignored the distinction and failed to develop culturally competent strategies that addressed health disparities and social inequities.

310.    Similar to Ms. Corrado, TMC, SCHURTZ and one or more of DOES 4-70, inclusive failed to correct insubordination by Ms. SHEPPARD's direct reports.

311.    Rather, uninformed COUNTY employees decided that Ms .SHEPPARD "had to go."

312.    The latest involved the same players that intervened to compel Ms. HOWE and Ms. SHEPPARD to falsify Ms. Corrado's performance review.   Ms. Corrado complained to FENGLER, and outspoken LGBTQ advocate and Julie Beardsley, the union representative.

313.    Ms. FENGLER, Ms. Reinhard's co-worker, officemate and friend, and uninformed about cultural and uninformed about cultural competence, along with Ms. Beardsley devised the uninformed discrimination allegations against Ms. SHEPPARD.   Upon information and belief, Ms. FENGLER identifies as female, lesbian.

314.    Ms. FENGELR and Ms. Beardsley both stated to other Public-Health staff that "[Ms. SHEPPARD] had to go" and they were working on the plan. Their plan was to have Ms. Reinhard complain to Ms. Beardsley to start an internal discrimination investigation against

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Ms. SHEPPARD. Again uninformed, Ms. FENGLER assured Ms. Reinhard that she would be protected by one or more of TMC, SCHURTZ and one or more of DOES 4-70, inclusive, just as Ms. Corrado had been protected.

315. In late summer or early fall 2019, Ms. SHEPPARD received notice that the COUNTY was investigating allegations of discrimination in and around Public Health.

316. By late fall 2019, Ms. SHEPPARD's challenge with Ms. Reinhard reached a critical point.

317. Ms. SHEPPARD complained to Carol Mordhorst, who had temporarily replaced Ms. HOWE, that Ms. Reinhard's insubordination and sub-par performance were interfering with the implementation and delivery of WIC compliant programs and services.

318. During a conversation with Ms. SHEPPARD about Ms. Reinhard's insubordination, Ms. Mordhorst stated that Ms. Reinhard and other direct reports complained that Ms. SHEPPARD was just "an angry black woman."

319. Due to the failure of the COUNTY to recognize and implement its own internal, culturally-sensitive training and supervision policies, the staff including and Ms. Mordhorst were completely unaware and uninformed about the severely racial statement: "angry black woman."

320. To address this issue, Ms. SHEPPARD spoke openly with Ms .Mordhorst, opposing the racially charged language in the workplace. Ms. Mordhorst expressed confusion in Ms. SHEPPARD's comments, so Ms. SHEPPARD asked Ms. Mordhorst if she would view some "Ted Talk" discussion about cultural competency, which was a major focus of the COUNTY's written inclusionary employment policies, but completely ignored in practice.

321. Rather than divert attention from the core issues with an HR or third-party investigation for discrimination, Ms. SHEPPARD approached and worked directly with Ms. Mordhorst to

address the use of the culturally insensitive and racist remark.

322.    Ms. SHEPPARD and Ms. Mordhorst participated in a very productive and informal discussion about the significance of certain words and phrases that have evolved into subtle, racism.

323.    By and through dialogue, Ms. SHEPPARD explained to Ms. Mordhorst how the use of the phrase "angry black woman" was racist and discriminatory.

324.    Based upon her extensive background and experiences, especially as a target of cultural insensitivity, Ms. SHEPPARD employed the terms of TSA, LAL, and HPO in addressing DEFENDANTS' complete lack of cultural competence, as defined under WIC § 5600.2 (a) Ms. SHEPPARD.

325.    Concurrently with and contrary to Ms. SHEPPARD's efforts with Ms. Mordhorst, from about October 2019 until about February 2020, DEFENDANTS' counsel's firm led by Ms. Jacob hired law firm VAN DERMYDEN MADDUX, to ostensibly investigate the discrimination allegations against Ms. SHEPPARD.   The allegations were meant to "catch" Ms. SHEPPARD and terminate her based upon malicious, but uninformed allegations.

326.    A second investigation occured with Ms. SHEPPARD as a witness.   Therefore, Ms. Jacob knows that Ms. SHEPPARD's claim of retaliation was, in part, for her participating in Ms. HOWE's SAGC, as well as refusing to falsify performance documents and refusing to voice compelled speech that also included viewpoint discrimination.

327.    On or about March 4, 2020. Ms. SHEPPARD was cleared by Van Dermyden and Maddux of any wrongdoing.

328.    Since the discrimination investigation failed to provide the grounds to terminate Ms. SHEPPARD with cause, TMC and SCHURTZ just rammed-through Ms. SHEPPARD's two (2) position demotion in violation of the terms of the Civil Service System and the HHSA

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Ordinance, and the FEHA.

329.    Ms. SHEPPARD is supposed to report to Ms. Johnson, but she is just a place holder performing very few effective responsibilities.    Evidently, Ms. Johnson is the subject of a discrimination complaint against her and she is not qualified for the position she holds.

330.    TMC and one or more of Does 4-70, inclusive have retaliated against Ms. SHEPPARD for her professional association with Ms. HOWE and removed her from the attendance of meetings for which Ms. SHEPPARD had been a regular attendee performing her assigned duties and more.

331.    During one interaction, Ms. Johnson told Ms. SHEPPARD that she was there to watch over Ms. SHEPPARD and that TMC and one or more DOES 4-70, inclusive were very upset that the COUNTY had to spend $52,000.00 to investigate the claims of discrimination leveled at Ms. SHEPPARD and other individuals under her supervision.

332.    Ms. SHEPPARD was denied a position, for which she applied, was qualified and was due a preference under the COUNTY's Civil Service System and the HHSA Ordinance. Ordinances.

333.    The open position was provided to, Jody Johnson, a less-qualified non-African-American, and non-complaining individual who did not meet the minimum qualifications for the position.  Ms. Johnson was awarded the position because TMC's nepotism and cronyism ensure that the hiring practices promote those persons whom TMC, SCHURTZ and one or more of DOES 1-70, inclusive can control, intimidate and threaten, like Heidi Corrado.

### *Hostile Work Environment*

334.    DEFENDANTS have a pattern and practice of maintaining a hostile work environment at HHSA against those who complain of unlawful conduct in the workplace and/or resist such unlawful conduct.  TMC prioritized Anne Molgaard's reduction, transfer and ultimate squeeze

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

over her efficiently serving the public at large.

335.    Ms. Molgaard was highly respected, well-liked, with strong positive professional reputation within HHSA and in the community because she served the public interest very efficiently.

336.    HHSA staff serving under Ms. Molgaard informed Ms. HOWE that they were distraught and disturbed by Ms. Molgaard's reduction and reassignment.

337.    Ms. Molgaard had been the acting HHSA director during the fire season and was demoted from her position into a position to frustrate her career in the hopes that she would eventually resign, a common COUNTY practice and a violation of the Civil Service System, COUNTY Ordinance 2.44.030 and the terms of TSA, LAL, and HPO.

338.    DEFENDANTS' and in particular TMC's purpose in demoting Ms. Molgaard was not to efficiently serve the public at large based upon merit, but to punish her to allow the benefits of nepotism, corruption, retaliation, abuse, and grant diversion to benefit TMC and DEFENDANTS, particularly the good 'ol lesbian cabal.

339.    Ms. HOWE raised the concerns regarding the disruption within HHSA with SCHURTZ, then acting HHSA Assistant Director of Administration about TMC's and COUNTY's failure to follow COUNTY Ordinances, rules, and policies that were being ignored in Ms. Molgaard's reduction and reassignment.

340.    Ms. HOWE requested that SCHURTZ communicate with staff the true reasons of Ms. Molgaard's reduction and reassignment because the public health staff would not trust the administration, which would interfere with HHSA serving the public efficiently and was causing emotional distress, disruption and disharmony in the workplace.

341.    Ms. Molgaard's wrongful treatment represents a long history of failed leadership as investigated and confirmed by both the GJ-2019 and GJ-2020.  Each failure is another display

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

of nepotism, denial of equal treatment and a breakdown in the candor and efficiency of serving the public.

342.    Before, during and after repeated failures to make strategic plans for public safety and health; specifically for underserved communities, including plans for emergency medical services (EMS); command and control, ambulances, diverse communication channels, pre-deployment of critical equipment and other emergency and critical infrastructure, the DEFENDANTS order, fund and conduct retaliatory discrimination investigations ("Retaliation"), against COUNTY employees in general and PLAINTIFFS, in particular.

343.    As a result of the Retaliation, Ms. HOWE was thwarted in her development, deployment and testing of strategic plans to make sure that the COUNTY was prepared for any and all public health disasters and the resources required to effective respond to them; for example Covid-19.

344.    As a result of the Retaliation, Ms. SHEPPARD was thwarted in her development, deployment and testing of culturally-sensitive strategic plans to make sure that the very diverse communities of the COUNTY had effective communication and other public health and safety plans for an emergency; for example Covid-19.

345.    As a result of the Retaliation, Ms. MORGAN was thwarted in providing the necessary medical services desperately needed by Foster Children, who cannot receive medical treatment because the COUNTY has failed to provide the resources to address the backlog of medical histories, which has delayed and denied appropriate access to medical attention during Covid-19.

346.    DEFENDANTS divert financial and other resources to no-work contracts and acceptance of low or non-performing employees all in return for loyalty and favors. Consequently, DEFENDANTS do not have the funds to acquire necessary, normal, customary

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

and required resources to address the Community needs.   The GJ-20 EMS Report is the most glaring failure of the CEO's and BoS obligations to the public

347.    As a consequence of the very public conduct by the COUNTY and its Managing Agents, the public-health profession is readily aware of the treatment potential offerees receive in accepting employment with the COUNTY.

348.    The COUNTY cannot attract, fill and provide for seamless succession planning for the positions crucial to public safety, health and EMS.

349.    After the resignation of Dr. Pace, DEFENDANTS could only attract an ex-felon public health officer who was chased out of Nevada after years of malfeasance, non-performance and other derelictions of duty.  Community outrage reversed the Health and Human Services Advisory Committee's recommendation to hire Dr. Iser.

350.    COUNTY does not implement policies and procedures to train COUNTY employees against compelling illegal speech; thereby ratifying the actions of the Managing Agents who, upon information and belief, have not been disciplined or suffered an adverse-employment action for their and each of their conduct.

351.    DEFENDANTS failed to establish policies and procedures and train COUNTY employees against violating PLAINTIFFS,' and each of their First Amendment rights when speaking on matters of public concern; thereby ratifying the actions of the Managing Agents who, upon information and belief, have not been disciplined for retaliating against PLAINTIFFS for engaging in speech pertaining to matters of public concern and exposing the Defendants' self-serving and illegal conduct.

352.    DEFENDANTS enforced the Illegal P&P, but failed to establish policies and procedures and train COUNTY employees against violating PLAINTIFFS,' and each of their Fourteenth Amendment rights to due process codified in COUNTY Ordinances, Civil Service

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

System, the terms of TSA, LAL, and HPO, and other statutorily-required policies; thereby ratifying the actions of the Managing Agents who, as of the drafting of this Complaint, have not been disciplined for failing to provide PLAINTIFFS and each of them their rights to due process.

353.    As per the GJ-19 and GJ-20 reports the County and BoS, by and through their Managing Agents established and enforced unwritten policies, failed to establish policies and procedures and train County employees against treating PLAINTIFFS, and each of them, differently based upon the PLAINTIFFS,' and each of their ages, sexual orientation, and race.

354.    Contrary to the terms of the Civil Service System, the HHSA Ordinance and the purpose of government; namely, to deliver responsive and responsible programs and services to the public at large, HHSA and the COUNTY by and through TMC, SCHURTZ, CONVERY, FENGLER and one or more of DOES 4-80, inclusive operate and enforce Illegal P&P based upon the terms of cronyism, nepotism, corruption, retaliation, abuse, grant diversion, and depriving meritorious employees of their constitutional rights, due process, and the benefits.

**FIRST CLAIM FOR RELIEF**
**Pleaded in The Alternative Pursuant to Fed. R. Civ. P 8(d)(2)**
**Illegal Intrusion on First Amendment Right**
**To Free Speech In Violation of 42 U.S.C. §1983**
**(Against Defendants TMC, SCHURTZ, CONVERY, FENGLER and DOES 4-70**
**inclusive In Their Individual Capacities)**

355.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

356.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

357.    PLAINTIFFS bring this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the

injured party.

358.    The First Amendment of the United States Constitution states: "Congress shall make no law abridging the freedom of speech, or the press." The First Amendment has been interpreted to apply to all government organizations in the United States. It applies to state and local governments through operation of the Fourteenth Amendment Due Process Clause, which incorporates the free speech protection of the First Amendment.

359.    Public employees have a right to stop the government from coercing or compelling speech and a right to not to have the government restrict speech based on the speech's viewpoint. Such restrictions are rarely permitted. The rationale for prohibiting suppression of public employee speech pertaining to matters of public interest is to protect employees from their superiors who may exercise their authority because the superior disagrees with the content of the employee's speech.  The government must meet a high standard for restricting speech in a public forum.

360.    The United States Supreme Court has developed a test to determine when First Amendment protection attaches to a public employee's speech. A public employee's speech is protected if (1) The speech is a matter of "public concern," (2) The employee spoke as a private citizen and not a public employee (i.e., speech is not pursuant to "official duties"); and (3) The employee's speech interest outweighs the agency's interest in efficiency and effectiveness. *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009).

361.    DEFENDANTs TMC, SCHURTZ and DOES 3-70, inclusive deprived Ms. SHEPPARD and Ms. HOWE of their rights under the First Amendment to the United States Constitution when they terminated Ms. HOWE and retaliated Ms. SHEPPARD for having voiced concerns against a hostile work environment, violations of the Civil Service Rules, questionable contracting practices, unlawful employment practices, violations of the Public

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Health laws for the State of California and the rights of employees protected under FEHA.

362.    DEFENDANT TMC took adverse employment action against Ms. HOWE as herein alleged, including but not limited to, terminating her employment. These adverse employment actions were proceeded by the silencing of other employees, like Carol Mordhorst and were such that a reasonable employee would have found them to be materially adverse in that the silencing and termination would dissuade a reasonable employee, under DEFENDANT TMC's and SCHURTZ' control, from engaging in protected speech activity.   The silencing and adverse employment actions reduced HHSA's and the COUNTY's efficiency of serving the greater public good and replaced the best qualified persons with unqualified, underperforming and insubordinate persons.

363.    PLAINTIFFS' speech and refusal to engage in compelled speech was a substantial motivating factor for the adverse employment actions taken against them by DEFENDANTs TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive.

364.    DEFENDANTS' intentional and negligent actions and failures, including but not limited to, inadequate training and hiring practices as alleged above as to PLAINTIFFS and each of them constitute violations of the Civil Rights Laws of the United States, 42 U.S.C. §1983. DEFENDANTS, while acting under color of state authority and law, deprived PLAINTIFFS of their federal and statutory right to free speech and right against compelled speech pursuant to the First Amendment.

365.    The conduct of DEFENDANTS TMC, SCHURTZ, CONVERY, and DEFENDANT COUNTY, in their individual capacities, at all times relevant and as set forth above, constitutes violations under color of law of PLAINTIFFS' rights, privileges and immunities guaranteed her by the First Amendment of the United States Constitution.

366.    DEFENDANTS' actions have caused and continue to cause PLAINTIFFS, and each of

them substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages and pension benefits, attorneys' fees, medical expenses, loss of future earnings and benefits, costs of suit, humiliation, embarrassment and anguish, all to her damage in an amount according to proof.

367.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, racist and discriminatory and done with ill will and intent to injure PLAINTIFFS and each of them and to cause them mental anguish, anxiety, and distress and their conduct did cause PLAINTIFFS and each of them did suffer mental anguish, anxiety, and distress

368.   DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and each of them with the intent to menace and injure, constituting oppression, fraud, and malice, entitling PLAINTIFFS and each of them to punitive damages against the individual DEFENDANT TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive,

WHEREFORE, Plaintiffs have been damaged and pray judgment as set forth below.

## SECOND CLAIM FOR RELIEF
**Pleaded in The Alternative Pursuant to Fed. R. Civ. P 8(d)(2)**
**Illegal Intrusion on First Amendment Right**
**To Free Speech In Violation of 42 U.S.C. §1983**
**(Against Defendant COUNTY)**

369.   PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

370.   PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

371.   PLAINTIFFS bring this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

party.

372.    The First Amendment of the United States Constitution states: "Congress shall make no law abridging the freedom of speech, or the press." The First Amendment has been interpreted to apply to all government organizations in the United States. It applies to state and local governments through operation of the Fourteenth Amendment Due Process Clause, which incorporates the free speech protection of the First Amendment.

373.    Public employees have a right to stop the government from coercing or compelling speech and a right to not to have the government restrict speech based on the speech's viewpoint. Such restrictions are rarely permitted.   The rationale for prohibiting suppression of public employee speech pertaining to matters of public interest is to protect employees from their superiors who may exercise their authority because the superior disagrees with the content of the employee's speech.   The government must meet a high standard for restricting speech in a public forum.

374.    The United States Supreme Court has developed a test to determine when First Amendment protection attaches to a public employee's speech. A public employee's speech is protected if (1) The speech is a matter of "public concern," (2) The employee spoke as a private citizen and not a public employee (i.e., speech is not pursuant to "official duties"); and (3) The employee's speech interest outweighs the agency's interest in efficiency and effectiveness. *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009).

375.    DEFENDANTs TMC, SCHURTZ, acting in their official capacities, and DOES 3-70, inclusive deprived Ms. SHEPPARD and Ms. HOWE of their rights under the First Amendment to the United States Constitution when they terminated Ms. HOWE and retaliated Ms. SHEPPARD for having voiced concerns against a hostile work environment, violations of the Civil Service Rules, questionable contracting practices, unlawful employment practices,

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

violations of the Public Health laws for the State of California and the rights of employees protected under FEHA.

376.    DEFENDANT TMC, in her official capacity, took adverse employment action against Ms. HOWE as herein alleged, including but not limited to, terminating her employment. These adverse employment actions were proceeded by the silencing of other employees, like Carol Mordhorst and were such that a reasonable employee would have found them to be materially adverse in that the silencing and termination would dissuade a reasonable employee, under DEFENDANT TMC's and SCHURTZ' control, from engaging in protected speech activity. The silencing and adverse employment actions reduced HHSA's and the COUNTY's efficiency of serving the greater public good and replaced the best qualified persons with unqualified, underperforming and insubordinate persons.

377.    PLAINTIFFS' speech and refusal to engage in compelled speech was a substantial or motivating factor for the adverse employment actions taken against them by DEFENDANTs COUNTY, TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive.

378.    DEFENDANTS' intentional and negligent actions and failures, including but not limited to, inadequate training and hiring practices as alleged above as to PLAINTIFFS and each of them constitute violations of the Civil Rights Laws of the United States, 42 U.S.C. §1983. DEFENDANTS, while acting under color of state authority and law, deprived PLAINTIFFS of their federal and statutory right to free speech and right against compelled speech pursuant to the First Amendment.

379.    The conduct of DEFENDANTS TMC, SCHURTZ, CONVERY, and DEFENDANT COUNTY, in their official capacities, at all times relevant and as set forth above, constitutes violations under color of law of PLAINTIFFS' rights, privileges and immunities guaranteed her by the First Amendment of the United States Constitution.

380.    DEFENDANTS' actions have caused and continue to cause PLAINTIFFS, and each of them substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages and pension benefits, attorneys' fees, medical expenses, loss of future earnings and benefits, costs of suit, humiliation, embarrassment and anguish, all to her damage in an amount according to proof.

381.    DEFENDANT COUNTY took adverse employment action against Ms. SHEPPARD as herein alleged, including but not limited to, reducing her access to information for and participation in meetings related to her employment. These adverse employment actions were such that a reasonable employee would have found them to be materially adverse and that they would have dissuaded a reasonable employee of DEFENDANT COUNTY from engaging in this protected speech activity. These adverse employment actions reduced HHSA's and the COUNTY's efficiency of serving the greater public good and replaced the best qualified persons with unqualified, underperforming and insubordinate persons.

382.    DEFENDANT COUNTY took adverse employment action against Ms. MORGAN as herein alleged, including but not limited to, reducing her access to information for and participation in employment opportunities and causing her to suffer extreme emotion distress for refusing the falsify a document exposing her to professional liability, loss of licenses and charges of misconduct.  These adverse employment actions were such that a reasonable employee would have found them to be materially adverse and that they would have dissuaded a reasonable employee of DEFENDANT COUNTY from engaging in this protected speech activity.  These adverse employment actions reduced HHSA's and the COUNTY's efficiency of serving the greater public good and replaced the best qualified persons with unqualified, underperforming and insubordinate persons.

383.    DEFENDANT COUNTY violated Civil Rights Laws of the United States, 42 U.S.C.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

§1983 when it was provided notice, but failed to take steps to prevent DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive from taking these illegal actions against PLAINTIFFS.

384.   DEFENDANTS' actions have caused and continue to cause PLAINTIFFS, and each of them substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages and pension benefits, attorneys' fees, medical expenses, loss of future earnings and benefits, costs of suit, humiliation, embarrassment and anguish, all to her damage in an amount according to proof.

385.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, racist and discriminatory and done with ill will and intent to injure PLAINTIFFS and each of them and to cause them mental anguish, anxiety, and distress and their conduct did cause PLAINTIFFS and each of them did suffer mental anguish, anxiety, and distress

386.   DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and each of them with the intent to menace and injure, constituting oppression, fraud, and malice, entitling PLAINTIFFS and each of them to punitive damages against the individual DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive,

387.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, as its long-standing custom and practice is to permit the types of Constitutional violations set forth above by persons in the positions occupied by TMC, SCHURTZ, CONVERY and one or more of DOES 4-70.

388.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, as COUNTY has delegated final policy-making authority to persons in DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70 position.

389.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY ratified the actions DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, after notice of the conduct, permitting the deprivation of Constitutional Rights and adverse actions to stand.

390.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY ratified the actions DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY failed to train, monitor, and supervise the conduct of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70. Wherefore, PLAINTIFFS have been damaged and pray for judgment as more fully set forth below.

### THIRD CLAIM FOR RELIEF
**Pleaded in the Alternative Pursuant to Fed. R. Civ. P. 8(d)(2)**
**Retaliation 42 U.S.C. §1983**
**(Against Defendants TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive In Their Individual Capacities)**

391.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

392.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. To state a claim of retaliation under §1983, a Plaintiff must allege: (1) that his conduct was protected by the Constitution; and (2) that the protected conduct was a substantial or motivating factor in any retaliatory acts taken by the state actor Defendants. *Pankey v. City of Concord*, 6-

CV-03737-JCS, 2008 WL 793873, at 9 (N.D. Cal. Mar. 24, 2008) (citing *Berry v. Atkins*, 93-CV-20473-WAI, 1995 WL 691869, at 3 (N.D. Cal. Nov.15, 1995)).

393.    Under the First Amendment, a public employee has a qualified right to speak on matters of public concern and an absolute right against compelled and coercive speech and creation of false and fraudulent reports.   In order to prove the defendant deprived or intruded upon a plaintiff's First Amendment rights, the plaintiff must prove the following additional elements by a preponderance of the evidence: 1) the plaintiff spoke as a private citizen and not as part of her official duties as a public employee; 2) the defendant took an adverse employment action against the plaintiff; and 3) the plaintiff's speech was a substantial or motivating factor for the adverse employment action.

394.    Here, PLAINTIFFS, and each of them spoke as private citizens, not part of their official duties or as a public employee when they refused to engage in compelled, fraudulent, false and coerced speech regarding DEFENDANTS, creating and signing false documents, and other employment practices in violation of law, including Ms. Molgaard's reduction and reassignment, Ms. Corrado's insubordination and misrepresentation to the State of California, and the general unfair, disparate and discriminatory conduct perpetuated by HHSA and the COUNTY and retaliating against Ms. HOWE by terminating her and usurping all of her duties, and Ms. SHEPPARD by blaming her for the cost of investigations of discrimination and retaliation, threatening her termination and otherwise usurping her stated duties and programs, and Ms. MORGAN for revealing TMC's and Ms. CONVERY's illegal demands to create and execute false documents.

395.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful termination of Ms. HOWE, depriving her of her First and Fourteenth Amendment Constitutional Rights.

396.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful reduction and isolation of Ms. SHEPPARD, misrepresented as an un-appealable employment action, depriving her of her First and Fourteenth Amendment Constitutional Rights and deceiving her about her civil service rights.

397.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful exclusion of Ms. MORGAN from employment opportunities and the  of Ms. SHEPPARD, misrepresented as an un-appealable employment action, depriving her of her First and Fourteenth Amendment Constitutional Rights and deceiving her about her civil service rights.

398.    The actions of DEFENDANTS  TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive, were made under color of state law.

399.    The actions of DEFENDANTS  TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive, resulted in the deprivation of Plaintiff's First Amendment Rights, and Plaintiff's Federal Statutory rights.

400.    Each of DEFENDANTS DEFENDANTS  TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive, personally participated in the deprivation of Plaintiffs' rights.

401.    Each of DEFENDANTS DEFENDANTS  TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive actions were the cause in fact of Plaintiffs' injuries.

402.    Each of DEFENDANTS DEFENDANTS  TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive actions were the proximate cause of Plaintiffs' injuries.

403.    The constitutional rights of Plaintiffs at all times relevant were clearly established, including at the time of the violation.

404.    As a legal result of the above described conduct of DEFENDANTS, and each of them PLAINTIFFS and each of them have sustained and will continue to sustain physical, mental, and

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, indignity and loss of consortium, as well as other unpleasant physical, mental, and emotional reactions, damages to their good names, reputations, standing in the community and other non-economic damages. PLAINTIFFS' protected conduct was a substantial or motivating factor in any retaliatory acts taken by DEFENDANT COUNTY, TMC, SCHURTZ and one or more of DOES 4-70, inclusive.

405.     As a further legal result of the above-described conduct by DEFENDANTS, and each of them, PLAINTIFFS and each of them were hindered, prevented and precluded from performing their usual activities causing PLAINTIFFS, and each of them to sustain damages for loss of income, wages, earnings, and earning capacity, pension contribution and credit time for working, benefits, and other economic damages, in an amount to be ascertained according to proof. PLAINTIFFS claim such amount as damages, together with prejudgment interest pursuant to California Civil Code §3287 and any other provision of law providing for prejudgment interest.

406.     As a further legal result of the above-described conduct of DEFENDANTS, and each of them, PLAINTIFFS suffered incidental, consequential and special damages in an amount according to proof.

407.     As a further legal result of the above-described conduct of DEFENDANTS, and each of them, PLAINTIFFS have and will continue to incur attorney's fees and costs in an amount according to proof.

408.     The conduct of DEFENDANTS and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for PLAINTIFFS' rights and for the deleterious consequences of DEFENDANTS' actions. DEFENDANTS and their agents and employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining DEFENDANTS because the COUNTY, BoS, TMC, SCHUTZ and one or more of

DOES 4-70, inclusive failed to discipline any other DEFENDANT for their conduct.

409.    DEFENDANTS TMC's, SCHURTZ's and one or more of DOES 4-70's, inclusive, malicious and oppressive conduct entitle PLAINTIFFS to punitive damages against TMC, SCHURTZ and one or more of DOES 1-50, inclusive, in an amount hereinafter alleged.

410.    Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, PLAINTIFFS have suffered stress-related health consequences. PLAINTIFFS claim general damages for such health problems in an amount to be proven at time of trial.

WHEREFORE, Plaintiffs have been damaged and pray judgment as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Pleaded in the Alternative Pursuant to Fed. R. Civ. P. 8(d)(2)**
**Retaliation 42 U.S.C. §1983**
**(Against Defendant COUNTY)**

411.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

412.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

413.    Under the First Amendment, a public employee has a qualified right to speak on matters of public concern and an absolute right against compelled and coercive speech and creation of false and fraudulent reports.   In order to prove the defendant deprived or intruded upon a plaintiff's First Amendment rights, the plaintiff must prove the following additional elements by a preponderance of the evidence: 1) the plaintiff spoke as a private citizen and not as part of her official duties as a public employee; 2) the defendant took an adverse employment action against the plaintiff; and 3) the plaintiff's speech was a substantial or motivating factor for the adverse employment action.

414.    Here, PLAINTIFFS, and each of them spoke as private citizens, not part of their official duties or as a public employee when they refused to engage in compelled, fraudulent, false and

coerced speech regarding DEFENDANTS, creating and signing false documents, and other employment practices in violation of law, including Ms. Molgaard's reduction and reassignment, Ms. Corrado's insubordination and misrepresentation to the State of California, and the general unfair, disparate and discriminatory conduct perpetuated by HHSA and the COUNTY and retaliating against Ms. HOWE by terminating her and usurping all of her duties, and Ms. SHEPPARD by blaming her for the cost of investigations of discrimination and retaliation, threatening her termination and otherwise usurping her stated duties and programs, and Ms. MORGAN for revealing TMC's and Ms. CONVERY's illegal demands to create and execute false documents.

415.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful termination of Ms. HOWE, depriving her of her First and Fourteenth Amendments Constitutional Rights.

416.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful reduction and isolation of Ms. SHEPPARD, misrepresented as an un-appealable employment action, depriving her of her First and Fourteenth Amendments Constitutional Rights and deceiving her about her civil service rights.

417.    DEFENDANTS' and each of their illegal conduct was the motivating and significant factor resulting in the wrongful exclusion of Ms. MORGAN from employment opportunities and the  of Ms. SHEPPARD, misrepresented as an un-appealable employment action, depriving her of her First and Fourteenth Amendments Constitutional Rights and deceiving her about her civil service rights.

418.    PLAINTIFFS' speech and refusal to engage in compelled false and fraudulent speech is protected speech.

419.    DEFENDANTS COUNTY, TCM, SCHURTZ, CONVERY, FELGER, and one or more

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

DOES 4-70, inclusive, acting in her, his and their official capacities, acted under color of law at all times herein relevant.

420.    DEFENDANTS' adverse employment actions against PLAINTIFFS as herein alleged were unprivileged, unlawful, and without a business purpose. DEFENDANTS' actions and failures as alleged herein constitute a pattern, practice and custom of violations of the Civil Rights Laws of the United States, 42 U.S.C. §1983. DEFENDANTS, while acting under color of state authority and law, wrongfully and intentionally retaliated against PLAINTIFFS for each of their participation in protected activity.  COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, as its long-standing custom and practice is to permit the types of Constitutional violations set forth above by persons in the positions occupied by TMC, SCHURTZ, CONVERY and one or more of DOES 4-70.

421.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, as COUNTY has delegated final policy-making authority to persons in DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70 position.

422.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. COUNTY is liable for the actions of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY ratified the actions DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, after notice of the conduct, permitting the deprivation of Constitutional Rights and adverse actions to stand.

423.    PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative. DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY ratified the actions DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, because COUNTY failed to train, monitor, and supervise the conduct of

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70. The training policies of DEFENDANT Mendocino COUNTY were not adequate to prevent violations of law by its employees and to train them to handle the usual and recurring situations with which they must deal.

424.    DEFENDANT Mendocino COUNTY was deliberately indifferent to the substantial risk that its policies and training were inadequate to prevent violations of law by its employee, known or obvious consequences of its failure to train its employee adequately; and the failure of DEFENDANT Mendocino COUNTY to prevent violations of law by its employees, and to provide adequate training, caused the deprivation of PLAINTIFFS' rights by DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive. To wit, DEFENDANT Mendocino COUNTY's failure to prevent violations of law by DEFENDANTS TMC, SCHURTZ, VERY and one or more of DOES 4-70, inclusive and failure to train DEFENDANTS them is so closely related to the deprivation of PLAINTIFFS' as to be the moving force that caused the ultimate injury, retaliatory termination, and reduction; respectively.

425.    Ms. HOWE and Ms. SHEPPARD opposed DEFENDANT TMC's and SCHURTZ' failure to apply the civil service disciplinary actions against Ms. Corrado, Ms. Reinhard or when Ms. HOWE and Ms. SHEPPARD promoted programs and policies that conflicted with TMC's, SCHURTZ' or one or more of DOES 4-70's, inclusive, personal interests, or when Ms. HOWE questioned the replacement of a qualified person, Ms. Molgaard with an unqualified person. DEFENDANTS TMC's and SCHURTZ' constitutional violations are well known to employees in the COUNTY and have resulted in many employees being demoted, terminated or forced to quit their employment, often just before such employees reach significant longevity milestones for pensions and other favorable employment benefits.

WHEREFORE, Plaintiffs have been damaged and pray judgment as set forth below.

**FIFTH CLAIM FOR RELIEF**

**Wrongful Termination (HOWE) Wrongful Reduction (SHEPPARD & MORGAN)**
**in Violation of 14th Amendment**
**Right to Property and Equal Protection Violation of 42 U.S.C. §1983**
**(Against Defendants TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive In**
**Their Individual Capacities)**

426.     PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

427.     PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

428.     PLAINTIFFS engaged in the protected activity described above and incorporate it as though set forth here in full.

429.     DEFENDANTS TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive wrongfully terminated the employment of Ms. HOWE in violation of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right in her employment with the COUNTY and the promise of investment in her career and a workplace free from retaliation, harassment and coercion.

430.     DEFENDANTS TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive wrongfully and isolated and demoted Ms. SHEPPARD in violation of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right in her employment with the COUNTY and the promise of investment in her career a workplace free from retaliation, harassment, discrimination and coercion.

431.     DEFENDANTS TMC, SCHURTZ, CONVERY, and DOES 4-70 inclusive wrongfully and isolated Ms. MORGAN in violation of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right in her

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

employment with the COUNTY and the promise of investment in her career and a workplace free from retaliation, harassment and coercion.

432.   DEFENDANTS TMC, SCHURTZ, and CONVERY as final policymakers, treated PLAINTIFFS differently than other similarly-situated COUNTY employees.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

**SIXTH CLAIM FOR RELIEF**
**(Wrongful Termination (HOWE) Wrongful Reduction (SHEPPARD &**
**MORGAN) in Violation of 14th Amendment Right to Due Process**
**Monell Action- In Violation of 42 U.S.C. §1983**
**(Against Defendant COUNTY)**

433.   PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

434.   PLAINTIFFS, pursuant to Fed. R. Civ. P. 8(d)(2), plead the following in the alternative.

435.   PLAINTIFFS bring this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

436.   PLAINTIFFS engaged in the protected activity described above and incorporated as though set forth here in full.

437.   DEFENDANTS acting in their official capacity acted under of color of law at all times herein relevant. A person acts "under color of law" when the person acts or purports to act in the performance of official duties under any state, COUNTY, or municipal law, ordinance or regulation.

438.   DEFENDANTS wrongfully and deprived Ms. HOWE of her rights to written notice before an adverse action, a hearing, appeal and the procedures in the HHSA Ordinance. DEFENDANTS, and each of their conduct violated of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right to due

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

process.

439.   DEFENDANTS wrongfully and deprived Ms. SHEPPARD of her rights to written notice before an adverse action, a hearing, appeal and the procedures in the HHSA Ordinance. DEFENDANTS and each of their conduct violated of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right to due process.

440.   DEFENDANTS wrongfully and deprived Ms. MORGAN of her rights to written notice before an adverse action, a hearing, appeal and the procedures in the HHSA Ordinance. DEFENDANTS and each of their conduct violated of the terms of TSA, LAL and HPO and the Civil Service System, the HHSA Ordinance and depriving her of her property right to due process.

Wherefore, PLAINTIFFS have been damaged and pray for judgment as more fully set forth below.

## SEVENTH CLAIM FOR RELIEF
### Retaliation In Violation of California Labor Code §1102.5
### (Against All DEFENDANTS)

441.   PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

442.    As set forth above, PLAINTIFFS each engaged in activity protected by California Labor Code §1102.5 that they each disclosed information to persons with authority over the PLAINTIFFS or another employee who has the authority to investigate, discover, or correct the violations and noncompliance with statutes as set forth above.

443.    As set forth above, PLAINTIFFS each engaged in activity protected by California Labor Code §1102.5 that they each provided information of what they reasonably believed were violation of state or federal statute, or a violation of or noncompliance with a local, state, or

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

federal rule or regulation.

444.    DEFENDANTS retaliated against PLAINTIFFS because they engaged in protected activity.

445.    The adverse actions taken by DEFENDANTS against PLAINTIFFS as set forth above, was substantially motivated by Plaintiff's protected activities.

446.    DEFENDANTS retaliated against PLAINTIFFS because DEFENDANTS perceived PLAINTIFFS as reporting, or about to report violations of law and regulation.

447.    PLAINTIFFS they reported and opposed discrimination by DEFENDANT TMC, SCHURTZ, FENGLER, and one or more of DOES 4-70, inclusive, in favor of a lesbian employee and against an African American (Ms. SHEPPARD).

448.    PLAINTIFFS reported and opposed violations of the Civil Service System, the HHSA Ordinances; i.e., the failure to apply performance reviews and measures equally, demands to execute or accept falsified reports.

449.    DEFENDANTs retaliated against Ms. HOWE and Ms. SHEPPARD because they opposed the failure to promote meritorious minority employees, like Ms. SHEPPARD.

450.    PLAINTIFFS have been damaged as a direct and proximate result of the retaliatory treatment set forth above in terms of lost wages, lost opportunities, emotional distress and other damages to be proven at trial.

WHEREFORE, PLAINTIFFS have been damaged and pray for judgment as more fully set forth below.

### EIGHTH CLAIM FOR RELIEF
**Discrimination in Violation of FEHA**
**Government Code §12940, et. seq.**
**(Against Defendant COUNTY)**

451.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through

75

354 above, as though fully set forth herein.

452.    At all times herein mentioned, the Fair Employment and Housing Act, California Government Code §12900-12996 (hereinafter "FEHA"), was in full force and effect and binding on DEFENDANTS. These statutes required DEFENDANTS to refrain from discriminating against any employee on the basis of ,*inter alia,* race, national origin, gender, sexual orientation and engaging in protected activity.

453.    FEHA makes it an unlawful employment practice for an employer to discriminate against an employee in "terms, conditions, or privileges of employment" on the basis of the employee's race, national origin, gender, sexual orientation and engaging in protected activity.

454.    PLAINTIFFS are members of protected classes in terms of sexual orientation, sex, age, and race.

455.    DEFENDANT COUNTY is an employer for purposes of the FEHA.

456.    COUNTY discriminated against Ms. HOWE on the basis of her sexual orientation, gender and engaging in protected activity as herein alleged.  Ms. HOWE's sexual orientation, heterosexual, gender, female and age were motivating factors in DEFENDANTS' decision to terminate Ms. HOWE.  Ms. HOWE was treated differently than other similarly situated non-heterosexual, male and younger employees.

457.    COUNTY discriminated against Ms. SHEPPARD on the basis of her race, sexual orientation, gender and for engaging in protected activity as herein alleged. Ms. SHEPPARD's race, African American, sexual orientation, heterosexual, gender, female and age were substantial motivating factors in DEFENDANTS' decision to fail to promote and reduce Ms. SHEPPARD's employment.   Ms. SHEPPARD was treated differently than other similarly situated non-Caucasian, non-heterosexual, male and younger employees.

458.    COUNTY discriminated against Ms. MORGAN on the basis of her race, sexual

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

orientation, gender and for engaging in protected activity as herein alleged. Ms. MORGAN's sexual orientation, heterosexual, gender, female and age were motivating factors in DEFENDANTS' decision to fail to promote and reduce Ms. SHEPPARD's employment.  Ms. SHEPPARD was treated differently than other similarly situated non-Caucasian, non-heterosexual, male and younger employees.

459.    COUNTY'S' adverse actions against PLAINTIFFS occurred under circumstances suggesting discriminatory intent based on protected classes in addition to the circumstantial evidence of similarly-situated comparators, not in PLAINTIFFS' protected classes being treated more favorably in the terms and conditions of employment.

460.    For example, during a car ride from Ukiah to Sacramento, Ms. HOWE conversed with TMC; wherein, TMC expressed direct evidence of discriminatory views about older employees in general, and of HOWE, in particular.

461.    Ms. HOWE asked TMC-Chandler if she minded if Ms. HOWE rolled-down the window because Ms. HOWE explained to TMC that she was experiencing a menopausal hot-flash.  TMC obliged; however, as the trip to Sacramento unfolded, TMC made age-derogatory comments like:  "oh, that has to be rough, I have no idea what that would feel like, I'm so glad not to be that old."

462.    TMC began expressing her views on the problems with having older employees with comments like: "I have found that their ability to make good decisions is diminished and they can't remember details and most of them struggle continually with IT."  "They just can't keep up with the technology of our modern world." "What is most startling to me is how poor they are at multi-tasking." TMC also stated:  "I need my managers to be multi-tasking all the time." TMC expressed her intention to "to retire before she got to the age where she was a drain on the system."

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

463.    Even though Ms. HOWE was reasonably believed she was secure in her employment, she was disturbed by TMC's expressions of ageist animus.

464.    PLAINTIFFS have been damaged as a direct and proximate result of the discriminatory treatment set forth above in terms of lost wages, lost opportunities, emotional distress and other damages to be proven at trial.

WHEREFORE, PLAINTIFFS have been damaged and pray for judgment as more fully set forth below.

### NINTH CLAIM FOR RELIEF
**Retaliation in Violation of FEHA**
**Government Code §§12940, (a) and (h), et. seq.**
**(Against DEFENDANT COUNTY And Does 1 Through 50)**

465.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

466.    PLAINTIFFS engaged in activities protected from retaliation by the FEHA, to wit: Ms. HOWE reported a co-worker's allegations of racial discrimination and inequality in the workplace to DEFENDANTS TMC and SCHURTZ throughout her tenure. No effective action was taken.

467.    PLAINTIFFS engaged in activities protected from retaliation by the FEHA, to wit: Ms. SHEPPARD reported a co-worker's allegations of racial discrimination and inequality in the workplace to DEFENDANTS TMC and SCHURTZ throughout her tenure.    Despite investigations and Ms. SHEPPARD's efforts to teach cultural competency to fellow employees, no effective actions were taken, except to deny Ms. SHEPPARD a codified promotion and reduce her employment.

468.    PLAINTIFFS engaged in activities protected from retaliation by the FEHA, to wit: Ms. MORGAN reported the compelled and coercive demand by her supervisor Ms. CONVERY to

falsify and submit a work document, which was eventually reported to DEFENDANTS TMC and SCHURTZ. There was no disciplinary or other corrective action taken.

469.    PLAINTIFFS' protected activities were a substantial motivating factor in the decision to impose the adverse actions against PLAINTIFFS set forth above.

470.    PLAINTIFFS have been damaged as a direct and proximate result of the retaliatory treatment set forth above in terms of lost wages, lost opportunities, emotional distress and other damages to be proven at trial.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below.

**TENTH CLAIM FOR RELIEF**
**Hostile Work Environment Harassment in Violation of FEHA**
**Government Code §§12940, (j)(1).**
**(Against DEFENDANTS, TMC, SCHURTZ And Does 4 Through 70, inclusive)**

471.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

472.    At all times herein mentioned, the FEHA, was in full force and effect and binding on DEFENDANTS. These statutes required DEFENDANTS to refrain from creating a hostile workplace and discriminating against any employee on the basis of race, national origin, gender, sexual orientation and engaging in protected activity.

473.    Through public reports and obvious personnel changes, other individuals who have had to succumb to the hostile work environment created by DEFENDANTS, TMC, SCHURTZ and one or more of DOES 4-70, inclusive are Stacey Cryer, Bryan Lowery, Diane Curry, Alan Flora, and Kristen McMenomey who are among others were terminated by force, undue influence and abuse of power and position to deflect responsibility, accountability and liability away from one or more of DEFENDANTS TMC, SCHURTZ, CONVERY and one or more of DOES 4-70, inclusive.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

474.    In order to keep their status, pensions, favorable separation terms and other employment benefits, Stacey Cryer, Bryan Lowery, Diane Curry, Alan Flora, Kristen McMenomey, as well as, Anne Molgaard refrained from exercising their First Amendment Rights and rights speaking against a hostile work environment, because they do not want to lose their job, be reduced, have their pension and retirement benefits cut, or otherwise lose the benefits of their careers with the DEFENDANT COUNTY.

475.    DEFENDANTS TMC, SCHURTZ, CONVER and FENGLER and one or more of DOES 4-70, inclusive created a hostile work environment because they abused their power, position, or status within the protected class of lesbians.  DEFENDANTS created a hostile environment by making false allegations of discrimination in the face of State-mandated culturally sensitive delivery of Public-Health services. DEFENDANTS violated the terms of TSA, LAL, and HPO and failed to comply with the Civil Service System and the HHSA Ordinance regarding incompetent employees and the falsification and submission of fraudulent work documents; as well as their abuse of COUNTY resources, grants, and resource allocation.

476.    Most if not all COUNTY employees refrain from exercising their First Amendment Rights, their rights under FEHA, Civil Service System, the HHSA Ordinance, and the COUNTY's Ordinances, policies, and procedures against retaliation and discrimination and the terms of TSA, LAL, and HPO, because a reasonable person witnessing the treatment of Ms. HOWE, Ms. SHEPPARD, Ms. MORGAN, Stacey Cryer, Bryan Lowery, Diane Curry, Alan Flora, Kristen McMenomey, as well as, Anne Molgaard would consider and in fact consider the work environment as hostile and abusive, especially to those who have a lot to lose by forced resignation, termination, or reduction at or near the achievement of significant benefit milestones.

477.    FEHA makes it an unlawful employment practice for an employee to harass employees

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

and otherwise instill fear and punishment in other employees to maintain illegal control of the employees exercise of the First Amendment and FEHA rights.

478.    The actions complained of herein were done by DEFENDANTS maliciously, fraudulently, and oppressively, and thus the on behalf of WALSH, HIATT CREEK is entitled to an award of punitive and treble damages, the amount of such damages to be established by proof at trial.

WHEREFORE, PLAINTIFFS have been damaged and pray for judgment as more fully set forth below.

## ELEVENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
**(Against Defendant COUNTY and Defendants TMC, SCHURTZ, CONVERY, FENGLER and DOES 4-70, inclusive)**

479.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

480.    DEFENDANTS, and each of them, and specifically, DEFENDANTS TMC, SCHURTZ, CONVERY, FENGELR and one or more of DOES 4-70, inclusive, intentionally and maliciously engaged in extreme and outrageous conduct studiously designed to inflict maximum humiliation, shame, mental and severe emotional distress on PLAINTIFFS. Defendants' conduct is not and should not be tolerated in a civilized society.

481.    DEFENDANTS conduct caused PLAINTIFFS pain, anxiety, inconvenience, mental distress, severe emotional distress, loss of enjoyment of life, loss of consortium, damage to career, damage to self image, misery, and other non-economic damages including suffering because DEFENDANTS' and each of their conduct was designed to destroy each of the PLAINTIFFS' financial lives and professional careers who cannot easily recover from a loss of employment and its benefits at such an old age.

482.    DEFENDANTS TMC's, SCHURTZ,' and one or more of DOES 4-70's, inclusive acts

of terminating Ms. HOWE's employment, placing mug shots around COUNTY offices when criminal conduct was absent, abusing COUNTY resources to pursue a civil harassment TRO and workplace TRO, and faking lack of knowledge about "dis-ease," all to destroy Ms. HOWE, because she opposed discrimination, disparate treatment and failure to comply with civil service rules, COUNTY ordinances and COUNTY rules, policies and procedures against retaliation and discrimination, were vial, malicious, oppressing and warrant punitive damages in order to punish DEFENDANTS TMC, SCHURTZ and one or more DOES 1-50, inclusive for public safety and the safety of other COUNTY employees who, without such deterrents, will in all likelihood, fall prey to punish DEFENDANT TMC's, SCHURTZ's, and one or more DOES 1-50, extreme and outrageous, vicious employment practices.

483.    DEFENDANTS TMC's, SCHURTZ's, and one or more of DOES 4-70's, inclusive acts of failing to promote Ms. SHEPPARD and reducing her employment, falsely accusing her of helping Ms. HOWE obtain evidence that contradicted TMC, abusing Ms. SHEPPARD's desire to advance and make Mendocino Better, as well as the treatment of Ms. HOWE and her employment, placing mug shots around COUNTY offices when criminal conduct was absent all sends a message to Public Health employees that speaking-up will not be rewarding and could be very destructive.

484.    DEFENDANTS TMC's, SCHURTZ's, CONVERY's and one or more of DOES 4-70's, inclusive acts of failing to discipline employees who engage in misconduct, coercion and compelled speech and reducing her opportunities in employment, all sends a message to Public Health employees that speaking-up will not be rewarding and could be very destructive.

485.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to menace and injure, constituting oppression, fraud, and malice, entitling PLAINTIFFS to punitive damages against the individual DEFENDANTS TMC, SCHURTZ, CONVERY FENGLER and one or more of DOES 4-70, inclusive, only.

Wherefore, PLAINTIFFS pray for judgment as more fully set forth below

## TWELFTH CAUSE OF ACTION
### Breach of Oral, Implied, and Implied-in-Fact Contracts
### (Against Defendant COUNTY)

486.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

487.    Pursuant to California Civil Code §§1619, et. seq. may be oral, implied, or implied by the conduct of the parties.

488.    The terms of the contract were that if employees performed the terms of TSA ,LAL, and HPO, then the employee could not be terminated, demoted or otherwise be subject to an adverse employment action.

489.    DEFENDANT COUNTY demanded that PLAINTIFFS attend, discuss, and incorporate into their daily activities the terms and conditions of their employment contract from TSA, LAL, and HPO.

490.    PLAINTIFFS and each of them, were rewarded with merit increases, advancement and promotions when they fulfilled the terms and conditions of TSA, LAL, and HPO, which were incorporated into the employment bargain.

491.    DEFENDANT COUNTY breached the oral, implied, implied-in-fact contracts when they terminated Ms. HOWE; failed to promote and reduced Ms. SHEPPARD; and otherwise failed to discipline Ms. CONVERY for her breach of the terms of TSA, LAL, and HPO.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

492.    DEFENDANT COUNTY refused to honor the oral, implied, and implied-in-fact agreement with Ms. HOWE and terminated her causing her to suffer lost wages, benefit accumulation, and related losses in a sum to be ascertained according to proof.

493.    DEFENDANT COUNTY refused to honor the oral, implied, and implied-in-fact agreement with Ms. SHEPPARD and demoted her causing her to suffer lost wages, benefit accumulation, and related losses in a sum to be ascertained according to proof.

494.    DEFENDANT COUNTY refused to honor the oral, implied, and implied-in-fact agreement with Ms. MORGAN and caused her to suffer lost opportunity and benefit accumulation, and related losses in a sum to be ascertained according to proof

WHEREFORE, PLAINTIFFS pray for judgment as more fully set forth below

### THIRTEENTH CAUSE OF ACTION
**(Intentional Interference with Prospective Economic Advantage & Contract)**
**Ms. SHEPPARD as Against Defendant TMC)**

495.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

496.    For at least twenty (20) years prior to her current employment with DEFENDANT COUNTY, Ms. SHEPPARD provided leadership training and consultation to large and small organizations, both for-profit and non-profit.

497.    Julie Beardsley attended a Strategic Planning series conducted by Ms SHEPPARD for the Opioid Coalition. She was impressed and asked if Ms SHEPPARD would do something similar and facilitate a planning session for the newly formed Census Group.

498.    Ms. SHEPPARD agreed and prepared a two (2) to three (3) hour workshop with follow-up modules a month prior to the Workshop Date.

499.    On the day of the workshop, approximately one (1) hour before she was to leave to do the Census Workshop, TMC asked Ms. SHEPPARD to do a trivial, last minute task that could

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

be done at any time.  When Ms SHEPPARD told TMC about her commitment, TMC told her to cancel it. Ms. SHEPPARD informed TMC that she could complete the task after the Workshop. Ms. SHEPPARD explained to TMC that the Workshop was scheduled a month ago. TMC asked her who requested that Ms. SHEPPARD conduct the Workshop and Ms. SHEPPARD informed her that Julie Beardsley, the COUNTY Public Health responsible for the 2020 Census.

500.    In or around August of 2019, in the turbulence after the retaliatory termination of Ms. HOWE, Ms. SHEPPARD had an oral agreement with the Community Foundation for an Executive Leadership Training.  The agreement was for Ms. SHEPPARD to provide services independent from her COUNTY employment duties and obligations using Ms. SHEPPARD's extensive amount of comp time that she had earned over the year.  The executive director of the Community Foundation is Megan Allende, TMC's close personal friend.

501.    Ms. SHEPPARD's agreement with the Community Foundation covered leadership training retreats and was not associated with any COUNTY Program.  The agreement called for the completion of a nine (9) month program, every Friday with an additional 'retreat' on Friday and Saturday at the beginning of the Program and a final 'retreat' at the end of the Program.

502.    Each Participant applied for a position and the fee to attend was $1,000.00 per person. Each Participant also received four (4) hours of individual executive coaching from Ms. SHEPPARD outside of Ms. SHEPPARD's COUNTY duties and obligations.

503.    Ms.Allende promised to pay Ms. SHEPPARD $12,000.00.

504.    Upon information and belief Ms. Allende received large grants and funds from the COUNTY for fire recovery efforts.   TMC controlled the funds to Ms. Allende and the Community Foundation.

505.    Upon information and belief Ms. Allende receives large grants and funds from the

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

COUNTY for other community-based programs and efforts.

506.    TMC knew of Ms. SHEPPARD's workshop and retreat relationship with the Community Foundation and the business advantage for Ms. SHEPPARD in conducting the Executive Leadership Training Program.

507.    From January to August 2019, Ms. SHEPPARD prepared programs, presentations, assessments, and other normal and customary consultant documents for a program similar to the Executive Leadership Training Program.

508.    Through an email, Ms. Allende informed Ms. SHEPPARD that she was cancelling Ms. SHEPPARD's conducting the Executive Leadership Training Program, which was the subject of Ms. SHEPPARD's independent agreement with the Community Foundation.

509.    Ms. Allende acquiesces and allowed Ms. SHEPPARD to conduct one-day retreat, which is vastly different from the agreement Ms. SHEPPARD had with Ms. Allende and the Community Foundation.

510.    Upon information and believe, TMC contacted Ms. Allende to cancel Ms. SHEPPARD's agreement to conduct the Executive Leadership Program, approximately two weeks prior to the start of the Program.

511.    In fact, at the last moment the organization responsible for the ultimate payment transferred from the Community Foundation to Leadership Mendocino and the negotiation to settle the dispute was conducted by Redwood Community Services.  Ms. SHEPPARD was only paid for the retreat ($1,500.00) and $500.00 for the months of work preparing the workshop, which was not minimum wage.

512.    DEFENDANT TMC's intentional conduct prevented Ms. SHEPPARD from conducting the Executive Leadership Training Program training and receiving the benefits from her agreement with the Community foundation and the business advantage for which Ms.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

SHEPPARD bargained.

513.    In addition to the damages Ms. SHEPPARD suffered from the illegal intrusion into her First and Fourteenth Amendment Rights, Ms. SHEPPARD suffered extensive business, financial and economic damages when DEFENDANT TMC interfered with Ms. SHEPPARD's agreement with the Community Foundation and her business advantages of performing the leadership program.

514.    DEFENDANT TMC's conduct as described herein evidences that she acted willfully, fraudulently, and maliciously within the meaning of Civil Code §3294 so as to entitle Ms. SHEPPARD an award of punitive damages.

WHEREFORE, PLAINTIFFS have been damaged and pray judgment as more fully set forth below

### FOURTEENTH CLAIM FOR RELIEF
### Failure to provide Name-Clearing Hearing

515.    PLAINTIFFS incorporate by reference the factual allegations of paragraphs 1 through 354 above, as though fully set forth herein.

516.    The United States Supreme Court has recognized that reputation combined with significant economic impact, such as foreclosure from future employment, might be a liberty interest requiring procedural due process. *Paul v. Davis*, 424 U.S. 693, 708- 710 (1976). In California, under the due process clause of the California State Constitution, reputation per se is a protected liberty interest. *Lubey v. City and County of San Francisco*, 98 Cal.App.3d 340, 346, 159 Cal. Rptr. 440 (1979). California courts do not require any showing of economic harm. *Id*   One has the opportunity to protect one's reputation and dignity by correcting the record related to employment. *Phillips v. Civil Service Com.*, 192 Cal.App.3d 996, 1002 (1987). Thus, Constitutional due process requires notice and opportunity to respond at a post-

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

termination "name-clearing" hearing before a neutral fact-finder(s), all of which was denied to Plaintiffs. *Board of Regents v. Roth*, 408 U.S. 564, 570, fn. 7 (1972).

517.    DEFENDANTS imposed employment-related stigmas making it more difficult to obtain other equivalent employment (Howe) and promotions or other employment (Sheppard), entitling them to name clearing hearings. *Id*. See also, *Paul,* 424 U.S. at 702 and *Holmes v. Hallinan,* 68 Cal.App.4th 1523, 1530-1531 (1999).   Ms. Howe requested a name-clearing hearing and in response to exercising her protected right, Defendants maliciously prosecuted her,[2] posted 'wanted' posters around county buildings, and ensured that the public-health sector would be wary of employing Ms. Howe in an executive capacity.  Ms. Sheppard was denied a name-clearing hearing and the information, documents and reports she was promised from the sham investigations to clear her name.   Ms. MORGAN was deprived of a name-clearing hearing when Ms. CONVERY was not disciplined for her demand that Ms. MORGAN falsify and submit a work document.

WHEREFORE, PLAINTIFFS have been damaged and pray judgment as more fully set forth below

### DAMAGES

518.    As a legal result of the above described conduct of DEFENDANTS, and each of them, PLAINTIFFS and each of them have sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, indignity and loss of consortium, as well as other unpleasant physical, mental, and emotional reactions,

_____

[2] To add insult to injury, during her TRO hearings and after the civil case was dismissed as an improper petition filed by the County on behalf of an individual, the Court intervened, *sua sponte,* to stop TMC's examination and her revealing crucial facts favorable to Ms. Howe and demanded that the parties settle.  Under the duress of an adverse ruling, Ms. Howe lived to fight another day.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

damages to their good names, reputations, standing in the community and other non-economic damages. PLAINTIFFS' protected conduct was a substantial or motivating factor in any retaliatory acts taken by DEFENDANT COUNTY, TMC, SCHURTZ and one or more of DOES 4-70, inclusive.

519.    As a further legal result of the above-described conduct by DEFENDANTS, and each of them, PLAINTIFFS and each of them were hindered, prevented and precluded from performing their usual activities causing PLAINTIFFS, and each of them to sustain damages for loss of income, wages, earnings, and earning capacity, pension contribution and credit time for working, benefits, and other economic damages, in an amount to be ascertained according to proof. PLAINTIFFS claim such amount as damages, together with prejudgment interest pursuant to California Civil Code §3287 and any other provision of law providing for prejudgment interest.

520.    As a further legal result of the above-described conduct of DEFENDANTS, and each of them, PLAINTIFFS suffered incidental, consequential and special damages in an amount according to proof.

521.    As a further legal result of the above-described conduct of DEFENDANTS, and each of them, PLAINTIFFS have and will continue to incur attorney's fees and costs in an amount according to proof.

522.    The conduct of DEFENDANTS and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for PLAINTIFFS' rights and for the deleterious consequences of DEFENDANTS' actions. DEFENDANTS and their agents and employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining DEFENDANTS because the COUNTY, BoS, TMC, SCHUTZ and one or more of DOES 4-70, inclusive failed to discipline any other DEFENDANT for their

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

conduct.

523.    DEFENDANTS TMC's, SCHURTZ's and one or more of DOES 4-70's, inclusive, malicious and oppressive conduct entitle PLAINTIFFS to punitive damages against TMC, SCHURTZ and one or more of DOES 1-50, inclusive, in an amount hereinafter alleged.

524.    Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, PLAINTIFFS have suffered stress-related health consequences. PLAINTIFFS claim general damages for such health problems in an amount to be proven at time of trial.

### PRAYER FOR RELIEF

Wherefore, PLAINTIFFS, and each of them, pray for judgment against DEFENDANTS and each of them as follows:

1. For an injunction mandating Defendant COUNTY implement policies and procedures to correct and prevent the violations of constitutional and statutory rights set forth above, and to train and monitor the implementation of such policies and procedures

2. For loss of pay, benefits, and perquisites of employment;

3. For loss of future earning capacity;

4. For general damages in an amount according to proof;

5. For special damages in an amount according to proof;

6. For prejudgment interest in an amount according to proof;

7. For reasonable attorney's fees and cost of suit;

8. For punitive damages against each DEFENDANT except COUNTY in an amount sufficient to punish and to deter future wrongful conduct;

9.  For statutory penalties and any other statutory relief;

10. For such other relief as the court may deem proper and equitable.

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF

Dated February 5, 2021          FORTHRIGHT LAW, P.C.

By   */s/ Dow W. Patten*
DOW W. PATTEN
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

PLAINTIFFS hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated February 5, 2021          FORTHRIGHT LAW, P.C.

By   */s/ Dow W. Patten*
DOW W. PATTEN
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND INJUNCITVE RELIEF