UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| BARBARA HOWE, et al., | Case No.  21-cv-00935-RMI |
| Plaintiffs, | |
| v. | **ORDER RE: MOTION TO DISMISS** |
| COUNTY OF MENDOCINO, et al., | Re: Dkt. No. 11 |
| Defendants. | |

Now pending before the court is Defendants' Motion to Dismiss (dkt. 11) Plaintiffs' Complaint (dkt. 1). Plaintiffs have filed a response in opposition (dkt. 14), Defendants have replied (dkt. 15), and the Parties have appeared before the court for oral argument (dkt. 22). The Complaint in this case is voluminous in that it spans 91 pages, encompasses 14 claims, and yet, despite all of its sound and fury, it ultimately offers nearly nothing of significance by way of pertinent factual allegations. Instead, the Complaint amasses mountains of irrelevant information which are then dotted and punctuated by a plethora of baseless conclusory statements, a number of *ad hominem* attacks, a series of mere labels, and a wealth of unreasonable inferences. Further, aside from being overwhelmed with irrelevant statements and conclusory assertions, the Complaint seems to go out of its way to make the ferreting out of its relevant factual allegations even more laborious by labeling one section as containing, "factual allegations relating to all causes of action," which is then further subdivided into sections whose titles indicate that the contents are related to allegations addressing the respective roles of the County of Mendocino, and each individually named Plaintiff. *See generally* Compl. (dkt. 1) at 10-18. However, the bulk of the allegations (relevant and otherwise) pertaining to each of these Plaintiffs are all lumped

together elsewhere and are intertwined in a non-linear fashion that appears designed to cause confusion because of being presented in what can only be described as a stream of consciousness format with no discernible method of organization. *See id.* at 21-56. In short, the Complaint reads more like a piece of experimental literature than the "short and plain statement," showing that these Plaintiffs are entitled to relief that is required by Rule 8. In any event, for the reasons described below, Defendants' Motion to Dismiss (dkt. 11) is granted and this case is dismissed with prejudice.

## PROCEDURAL BACKGROUND

The instant Complaint was filed on February 2, 2021 (dkt. 1), however, the history of this case predates this particular iteration. Last year, these same Plaintiffs filed previous iterations of this same lawsuit before the Hon. Susan Illston who dismissed their operative complaint twice, and upon being admonished that they likely would have only one more chance at amending, Plaintiffs dismissed their case and refiled their amended complaint as a new case while, this time, consenting to proceed before a magistrate judge. *See generally Howe et al v. Mendocino County et al*, 3:20-cv-02622-SI (Filed 04/15/2020) (hereafter, "*Howe-I*").

The first complaint in *Howe-I* was filed only by Barbara Howe and Jani Sheppard, and named the County of Mendocino, Tammy Moss Chandler and William Schurtz (in their individual capacities), as well Does 1 through 50, as defendants. *See Howe-I* (dkt. 1). In that iteration of their complaint, despite spanning 131 pages, and pleading 13 federal claims and 9 additional state-law claims, Judge Illston dismissed the entire complaint with leave to amend (except for two state law claims that were dismissed with prejudice) while noting that "Plaintiffs Barbara Howe and Jani Sheppard filed a 130+ page complaint that, despite its volume says surprisingly little." *See Howe-I*, Order (dkt. 28) at 1. Plaintiffs then filed a first amended complaint ("FAC") in *Howe-I*, through which they added a Plaintiff (Carol Morgan) and two Defendants (Sharon Convery and Katherine Fengler, in their individual capacities), while reducing the overall length of the amended complaint to about 85 pages. *See Howe-I*, FAC (dkt. 31). This time, Plaintiffs pleaded 4 federal claims and another 7 state-law claims. *See id.* Once again, Judge Illston dismissed the FAC and (while warning that this would be Plaintiff's final opportunity to amend) it was once again noted

United States District Court
Northern District of California

1   that "[d]espite over 80 pages of allegations . . . the allegations are conclusory and not plead with

2   sufficient particularity." *See Howe-I*, Order Dismissing FAC (dkt. 43) at 8.

3          In both dismissal orders, Judge Illston undertook the onerous task of separating the

4   mountains of irrelevant statements and conclusory statements from the very few pertinent factual

5   allegations that were buried throughout the voluminous complaint. No doubt, a great deal of effort

6   was expended in searching for needles in a very large haystack only to ultimately realize that the

7   haystack contained no needles at all. Because Judge Illston was skeptical as to whether or not

8   Plaintiffs would ever be able to adequately plead what was now reduced to four federal claims

9   (three of which were pleaded through four alternative theories), the court focused its second

10  dismissal order on the four federal claims because "if they were dismissed, plaintiffs could no

11  longer assert federal jurisdiction," in which case, Judge Illston found that it would be better "to

12  leave the California claims for a California judge." *Id*. at 4. The claims were: (1) illegal intrusion

13  on free speech rights under the First Amendment; (2) a municipal liability claim for retaliation for

14  exercising free speech brought under *Monell*[1]; (3) another municipal liability claim for wrongful

15  termination / adverse employment action in violation of equal protection pursuant to *Monell*; and,

16  (4) wrongful termination in violation of due process pursuant to *Monell*. *See Howe-I*, Order (dkt.

17  43) at 5. Additionally, each of Plaintiffs' three *Monell* claims were pleaded under the following

18  four alternative theories: (a) based on official policy, practice, or custom; (b) based on the act of a

19  final policymaker; (c) based on ratification; and (d) based on the failure to train or supervise. *Id*.

20  As detailed below, Judge Illston meticulously parsed the contents of the 85-page complaint in

21  order to separate the allegations pertinent to each Plaintiff as detailed below.

22  <u>Pertinent Facts from the FAC in Howe-I:</u>

23         Plaintiff Barbara Howe is a former employee of Mendocino County's Health and Human

24  Services Agency ("HHSA") where she worked from October of 2017 until May 30, 2019; Ms.

25  Howe alleged she was "forcefully terminated" through "compelled speech" when she was asked to

26

27  ─────────────

28  [1] *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) (providing plaintiffs a method to sue municipalities for policies, practices, or customs that caused specified types of constitutionally cognizable harm to an individual or group).

United States District Court
Northern District of California

1    sign a resignation letter "under duress" and upon threat of termination. *Id*. at 1. Ms. Howe also

2    alleged that she made certain comments on May 15, 2019 to certain affiliates and emergency

3    response partners of Mendocino County who were involved in the Public Health Emergency

4    Preparedness Program ("PHEPP"); specifically, Ms. Howe alleges that she stated that ambulances

5    likely would not be available during the next major disaster, such as a wildfire, because her

6    supervisors (including Defendant Tammy Moss Chandler) had "disrupted a flexible, multi-

7    company ambulance system [in order] to divert the contract to a favored provider." *Id*. at 1-2.

8    Additionally, Ms. Howe and co-plaintiff Jani Sheppard also alleged that they gave a subordinate

9    HHSA employee, Ms. Heidi Corrado, who the FAC chose to refer to as the "preferred lesbian," a

10   negative performance review on May 20, 2019. *Id*. at 2. Ms. Howe and Ms. Sheppard then alleged

11   that their supervisors, Defendants William Schurtz and Tammy Moss Chandler, demanded that

12   they change the performance evaluation in question to reflect a more positive outlook. *Id*.

13   Defendant Chandler then reportedly told both Ms. Howe and Ms. Sheppard to stop raising issues

14   with Ms. Corrado's performance. *Id*. On this basis, Ms. Howe alleged that she was retaliated

15   against for her speech and actions when several days later, on May 24, 2019, she decided to sign a

16   resignation letter presented to her by Defendant Chandler under threat of termination if she did not

17   voluntarily resign. *Id*. Following her signing of the resignation letter, Ms. Howe alleged that

18   Defendants later sought baseless temporary restraining orders against her as part of a campaign to

19   destroy her reputation, which she suggested was further retaliation for her exercise of her alleged

20   free speech rights. *Id*. At bottom, Ms. Howe alleged she was the subject of discrimination because

21   she is heterosexual, because of her gender, her age, and due to her having engaged in protected

22   activity – in support of which, she cited comments (without context) attributed to Ms. Chandler

23   about how older employers are incapable of making good decisions, multitasking, and how they

24   struggle with technology. *Id*.

25        Ms. Sheppard has been employed by HHSA from May 2018 to the present. *Id*.  Ms.

26   Sheppard also alleged retaliation, surmising that the cause was Defendant Chandler's mistaken

27   belief that Ms. Sheppard was the person who provided evidence in the TRO hearings against the

28   County and in favor of Ms. Howe. *Id*. As a result, Ms. Sheppard alleged that she was subjected to

4

a "sham" discrimination investigation concocted by Defendant Katherine Fengler and two other employees, Ms. Meredith Reinhard (who reports directly to Ms. Sheppard) and Ms. Carol Mordhorst, who is alleged to have stated at some point that Ms. Sheppard "had to go." *Id*. at 2-3. The discrimination investigation allegedly concerned Ms. Sheppard's activities in directing HHSA funds to underserved communities, which she was allegedly authorized and directed to do by State law. *Id*. at 3. Ms. Sheppard also alleges that Ms. Mordhorst told her that Ms. Reinhard and certain other persons who are also subordinates of Ms. Sheppard reportedly called her an "angry black woman." *Id*. Ms. Sheppard's intrusion of speech claim surrounds an initiative about tobacco use that she was supervising; in which regard, she alleged that Defendant Chandler prohibited HHSA staff from speaking with members of the County Board of Supervisors about the initiative. *Id*. At a meeting pertaining to this initiative in September of 2019, Ms. Sheppard alleges that she stated publicly that she was not permitted to speak with supervisors and that Defendant Chandler was not able to engage in formal strategic planning; further, Ms. Sheppard voiced her own frustration about an overall lack of leadership since Ms. Howe's departure. *Id*. Ms. Sheppard then alleged that she was retaliated against for her association with Ms. Howe by being excluded from certain meetings, by being subjected to a discrimination investigation, and by being demoted twice. *Id*. The FAC then alleged that Defendant William Schurtz justified the demotion by stating that Ms. Sheppard had not completed her probationary periods. *Id*.

Plaintiff Carol Morgan has worked for HHSA from December 2017 to the present as a Senior Nurse Care Manager. *Id*. Ms. Morgan's claim primarily involved the conduct of Defendant Sharon Convery, who allegedly attempted to have Ms. Morgan "falsify" an HR questionnaire after the interview of Ms. Hashimoto, a job candidate, on January 30, 2020. *Id*. Ms. Morgan also alleged that she has spoken up against the backlog of case histories and the failure of the County's managing agents to execute strategic plans that meet with her approval, a condition which she alleged has prevented foster children from receiving medical services. *Id*. at 3-4. Ms. Morgan claimed she was retaliated against for her actions and speech in this regard by being denied a promotion. *Id*. at 4.

//

1    *Pertinent Holdings from the Second Dismissal Order in Howe-I:*

2         Initially, as mentioned, Judge Illston's skepticism about Plaintiffs' ability to adequately

3    plead their federal claims resulted in an analysis of only those claims such that if Plaintiffs proved

4    unable to properly plead a single federal claim, the state-law claims would be better situated in a

5    state court. *Id.* As for the municipal claims brought against the County of Mendocino under 42

6    U.S.C. § 1983, pursuant to *Monell*, Judge Illston found that "[f]or all four of the causes of action

7    above, plaintiffs have failed to adequately plead and articulate the alleged official policy, practice,

8    or custom . . . [instead, whereas] like the original complaint, the FAC is replete with general

9    references to 'illegal policies and procedures,' it says very little, if anything, distilling what

10   exactly the policy, practices, or customs are." *Id.* at 6. Plaintiffs' § 1983 claims against individual

11   defendants fared no better as Judge Illston found that Plaintiffs had failed to allege a causal

12   connection for each defendant sued in an individual capacity. *Id.* at 7. More specifically, regarding

13   Plaintiffs' claim about "illegal intrusion on First Amendment right to free speech," Judge Illston

14   construed this as a claim for retaliation and found that "[d]espite over 80 pages of allegations,

15   plaintiffs' theory for the first cause of action never fully bakes – plaintiffs have not alleged what

16   actions, if any, defendants took to chill protected speech." *Id.* at 8. Noting that "Plaintiffs'

17   allegations for the first cause of action are virtually identical to those of the second cause of

18   action," Judge Illston similarly dismissed the second cause of action entitled, "retaliation for

19   exercising free speech, *Monell* action," upon finding that "[a]gain, the allegations are conclusory

20   and not plead with sufficient particularity." *Id.* Plaintiffs' equal protection claim was similarly

21   dismissed due to the failure to "systematically go through an analysis for each plaintiff bringing

22   this cause of action alleging how each plaintiff was treated differently based on their membership

23   in a protected class." *Id.* at 9. Lastly, Plaintiffs' due process claim was similarly dismissed due to

24   the fact that it was "not clear what process each respective plaintiff was allegedly denied." *Id.* In

25   granting Plaintiffs leave to amend once more, Judge Illston mentioned that "[t]his will likely be

26   the last time the Court grants plaintiffs leave to amend." *Id.* Following the dismissal of the FAC in

27   *Howe-I*, rather than filing another amended pleading, Plaintiffs instead chose to voluntarily

28   dismiss their case without prejudice in November of 2013. *See Howe-I* (dkt. 50) at 1.

United States District Court
Northern District of California

## FRACTUAL ALLEGATIONS IN THE COMPLAINT AT BAR

This is essentially the third attempt at pleading the same claims for Plaintiffs Howe and Sheppard (and the second attempt for Plaintiff Morgan), and because the claims are still not properly pleaded, the undersigned will do that which Judge Illston indicated she would do – that is, dismiss the case with prejudice. As mentioned above, because the operative complaint is replete with irrelevant statements, conclusory assertions, and statements that constitute unreasonable inferences, fishing through the 91-page Complaint for pertinent factual allegations has been unreasonably laborious. Nevertheless, the court has carefully parsed through the Complaint in order to identify each statement that constitutes a pertinent allegation of fact – a recitation of which follows. Suffice it to say, all that has changed from the previous iterations of this complaint is that Plaintiffs have added still more conclusory statements, labels, and unreasonable inferences to the same basic factual allegations that were previously dismissed.

Following a description of the Parties involved, the Complaint begins with an introductory section that consists of one irrelevant statement (stating that Plaintiffs have over 100 years of experience "working in large public institutions"), one unreasonable inference (stating that "Plaintiffs made complaints, exercised their rights to free speech regarding matters of heightened public concern, and resisted unlawful practices engaged in by the County; thereafter they were subjected to adverse employment actions"); and, for good measure, one conclusory statement ("[t]he retaliation engaged in by Defendants has impeded and interfered with significant public health, welfare and safety programs and services, damaging the health, safety and welfare of the community."). *See* Compl. (dkt. 1) at 1-7.

### Allegations Related to the County of Mendocino

The Complaint then ventures to list a number of generic and mundane County Ordinances, under the heading, "County Policies," that never end up being tethered to specific actions or omissions that would implicate them in setting forth a *Monell* claim. *See id*. at 7-9. Specifically, one ordinance provides that upon its establishment, the Mendocino County Department Public Health shall, in the administration of its affairs, conform to the minimum requirements of the State of California's regulations governing state and federal financial assistance to local health

1    departments. *Id*. at 7. Another ordinance provides that County employees in the Health

2    Department shall have first priority for filling vacancies for higher positions so long as they meet

3    the minimum "educational, professional and experience requirements," and that all promotions,

4    appointments, and dismissals shall be memorialized in writing. *Id*. at 7-8. The third cited

5    ordinance again provided that employee dismissal, suspension, or reductions in rank or

6    compensation must be memorialized in writing attended with the specific reasons for the action

7    taken. *Id*. at 8. Plaintiffs also cite to two provisions of state law, the first of which provides that

8    public mental health services shall be "client-centered, culturally competent and fully

9    accountable," while the other provision ventures to define dishonesty and lying to include

10   falsification concerning work, work records, and time cards. *Id*. at 8-9.

11       Plaintiffs then list 9 items that they characterize as "County Practices," however, these

12   consist of nothing more than mere labels, conclusory statements, and unreasonable inferences

13   because nowhere in the Complaint are any of these alleged practices borne out by associated

14   factual allegations. *See id*. at 9-10. The first of these "practices" is a statement to the effect that the

15   County's Board of Supervisors, through their managing agents, "have an established practice of

16   failing to formally establish and monitor policies to address county-wide issues of public safety,

17   health, economic, environmental and other needs of the community." *Id*. at 9. The essence of the

18   remainder of Plaintiffs' assertions of Mendocino County's "practices" is little more than

19   conclusory statement to the effect that the managing agents of the Board of Supervisors

20   (essentially the upper management of the County's Health and Human Services Agency) have

21   usurped power and abandoned the agency's mission in lieu of benefitting their individual and

22   collective interests. *Id*. at 9-10.

23       The essence of this entire lawsuit, apart from being rooted in some petty and routine

24   workplace bickering, seems to boil down to Plaintiffs' baseless and conclusory assertion that

25   HHSA managers operated the agency in a manner that rendered it (to put it in Plaintiffs' words)

26   into a "good ol' white lesbian club," thereby discriminating against Plaintiffs because of their

27   heterosexuality, or at times because of their resistance to HHSA managers' efforts to protect and

28   promote a person that Plaintiffs characterize as "the preferred lesbian." *Id*. at 31; *see also id*. at 34

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (where Plaintiffs allege being frustrated in the discharge of their duties due to the assertion that

2   they were not permitted to take any adverse actions against a person due to the assertion that as "a

3   lesbian" that person "was protected."); *see also id*. at 45 (where Ms. Howe baselessly proclaims

4   that, *inter alia*, her heterosexual orientation was "a threat to the existing power structure" at

5   HHSA); *see also id*. at 49 (where Plaintiffs assert that one of Plaintiff Sheppard's subordinates,

6   Ms. Corrado – to whom the Complaint previously referred as "the preferred lesbian" – once

7   complained about Ms. Sheppard to a higher ranking manager, described by the Complaint as such:

8   "[u]pon information and belief, Ms. Fengler identifies as female, lesbian."); and, *see also id*. at 53

9   (wherein Plaintiffs describe the management structure at HHSA as "the good 'ol (sic) lesbian

10  cabal."). This is the true essence of Plaintiffs' *Monell* allegations – to wit, Plaintiffs contend that

11  due to an unwritten "policy" of not enacting policies, a power vacuum came into existence at

12  HHSA, and certain high ranking HHSA managers reportedly coopted the agency and used it for

13  their personal purposes by creating the "cabal" described in the Complaint. However, as discussed

14  below, these statements are mere conjecture and hyperbole, and more importantly, these

15  statements are devoid of any allegations through which a causal connection can be established

16  between the alleged "lack of policies" that created the power vacuum which supposedly resulted in

17  the existence of this so called "cabal," and any actionable harms alleged by these Plaintiffs.

18          Putting this issue aside momentarily, this Complaint also fails to allege any actionable

19  harm by any of these Plaintiffs because it simply repeats its pattern of labeling things in patently

20  incorrect but seemingly advantageous ways – however, mere labels cannot substitute for pertinent

21  factual allegations in resisting a motion to dismiss. For example, as shown below, the Complaint

22  details certain insubordination by Plaintiffs but then labels those insubordinate acts and statements

23  as "protected free speech," and then labels the ensuing employee discipline as "illegal retaliation

24  for constitutionally protected activity." Elsewhere in the Complaint, four pages are dedicated to

25  discussing two reports alleged to have issued from the Mendocino County Civil Grand Jury

26  (entitled, "Who Runs Mendocino County?"), through which Plaintiffs present a series of irrelevant

27  statements (*see id*. at 18-21) that boil down to alleged findings from which Plaintiffs seek to

28  bolster their narrative that the County's "operational decision-making subordinates the public at

large to Defendants' favored and preferred interests, with very little strategic purpose." *Id*. at 18.

*Allegations Related to Plaintiff Barbara Howe*

Ms. Howe begins her allegations by noting that she identifies as a female heterosexual above the age of 40. *Id*. at 10. She then alleges that she was employed as an Assistant Director for HHSA between October 16, 2017 and May 24, 2019. *Id*. at 11. Thereafter, Ms. Howe recites a series of past achievements that are of little to no consequence in that they are unrelated to any of her federal claims. *See id*. at 11-12. In short, after Ms. Howe started working for HHSA, she became dissatisfied with her supervisors' performance of their job duties in that she perceived there to be a lack of clear policies and protocols in various regards which "created confusion and disharmony" among those employees "who did not enjoy preferential treatment." *Id*. at 12.

The Complaint notes that before her resignation, Ms. Howe, together with Ms. Sheppard, and a non-party referred to as Dr. Pace were about to establish a centralized communication system to serve as a command and control center for controlling certain emergency resources such as ambulances and certain other first responders. *Id*. at 22. At some point in time (ostensibly some time in 2019) Ms. Howe publicly disparaged her bosses when she informed a group of people including county residents and emergency response partners "that there was a very high probability that ambulance service would not be available[] because [County] CEO Carmel Angelo by and through [Defendant Chandler] had disrupted a flexible, multi-company ambulance system [in order] to divert the contract to a favored provider." *Id*. at 29. The Complaint then states that instead of being rewarded for her efforts, Ms. Howe wound up being "compelled" to resign and the County "installed Heidi Corrado, the preferred lesbian[,] to preserve and protect the 'good ol' white lesbian club.'" *Id*. at 30-31. The Complaint also proclaims that when her superiors at HHSA instructed Ms. Howe and Ms. Sheppard to approve Ms. Corrado's "satisfactory completion of her probationary period," that being instructed to do so was an offense "against their rights against compelled speech." *Id*. at 31-32. The Complaint then dedicates five full pages to describing events that boil down to the following: (1) Ms. Howe and Ms. Sheppard viewed their subordinate Ms. Corrado to be insubordinate and unsuitable for her position; (2) as a result, they refused to give her a positive evaluation and declared that Ms. Corrado had failed to satisfactorily

United States District Court
Northern District of California

complete her probationary period; (3) in their capacities as persons in charge, Defendants

Chandler and Schurtz mandated that Ms. Corrado be given a satisfactory performance appraisal

(which the Complaint repeatedly labels as "compelled speech") and further directed Ms. Howe "to

do nothing and stop raising and discussing the issue and that Ms. Corrado, a lesbian, was

protected"; and, (4) Ms. Sheppard and Ms. Howe (in a twist of irony) decided to make a show of

their own insubordination by rejecting their bosses mandates and giving Ms. Corrado a negative

evaluation that "adequately reflected her subpar performance [based largely on Ms. Corrado's

alleged insubordination]." *Id*. at 31-35. As a result, in May of 2019, Ms. Howe was offered an

opportunity to resign – upon threat of being fired – and when she was presented with a resignation

letter that she signed, the Complaint once again labels this as a "demand for her compelled speech

by her signature," and thereafter, Mr. Howe's resignation is consistently re-labeled as a "forced

termination." *Id*. at 35.

As for the details associated with Ms. Howe's "compelled termination" based on the

"compelled speech" that constituted her signature on a resignation letter that was offered to her in

lieu of being fired, a later portion of the Complaint provides that information, as well as some

information about what happened after Ms. Howe signed her resignation letter. *See id*. at 40-46. In

this regard, Ms. Howe's allegations only provide that, one day, Defendant Chandler entered Ms.

Howe's office and "cornered her inside with no open space . . . [and] showed a very aggressive

stance and handed Ms. Howe a piece of paper." *Id*. 40. Ms. Howe was reportedly told that she

"would be terminated if she did not sign her name to the compelled speech." *Id*. at 41. Ms. Howe

was also reportedly told that "a Sheriff was on-call on the HHSA campus and he would escort Ms.

Howe, by force if necessary, if she refused to leave . . . [therefore] under duress and under threats

by [Defendant Chandler and Ms. Heidi Dunham, a non-party] Ms. Howe did not act freely, but

was compelled to sign her name to compelled speech." *Id*. However, in the very next paragraph,

the Complaint contradicts itself by stating that, "Defendants forced Ms. Howe to resign because

she absorbed and implemented [various "leadership" programs under names like "Turn the Ship

Around" and "Leadership at All Levels,"] which earned her the trust and utmost respect of her

staff, peers, and the public." *Id*. at 41. The insistence on including this contradictory assertion in

11

the operative complaint is further indicative of Plaintiffs' insistence on filling their complaints with bluster and ranting rather than providing the "short and plain" statement required by Rule 8. This same stark contradiction (being fired for being too good at her job, as opposed to being fired because her heterosexuality supposedly posed a threat to the office power structure) appeared in both previous iterations of this complaint as well. *See Howe-I*, Case No. 20-cv-2622-SI, FAC (dkt. 31) at 46; *see also id.*, Compl. (dkt. 1) at 22-23. What is strange about its reappearance in the instant Complaint is that in the first of Judge Illston's two orders dismissing Plaintiffs' complaint, Judge Illston actually noted this discrepancy. *See Howe-I*, Order (dkt. 28) at 2.

In any event, following the signing of the resignation letter, Ms. Howe began to send various text messages to Defendant Chandler. *See Howe-II*, Compl. (dkt. 1) at 42-43. In one message Ms. Howe asked "about the reason for her termination," but in another message she "used the term 'dis-ease'" by which she meant that Defendant Chandler and certain other County employees "were going to be at 'dis-ease' for having implemented the malicious compelled termination." *Id*. Because Defendant Chandler interpreted this text message as stating or implying that "Ms. Howe was going to give some sort of disease to her," proceedings were instituted to secure a temporary restraining order against Ms. Howe. *Id*. at 43-44. However, in classic conclusory fashion, the Complaint re-labels this as "an irrational fear of Ms. Howe's use of the term 'dis-ease' in the text messages and in direct retaliation for Ms. Howe's protected activities, [Defendants] attempted to destroy Ms. Howe's career by filing for a restraining order." *Id*. at 43. The restraining order proceedings, however, did not come to fruition because "[t]he parties reached a settlement agreement and the case was been (sic) dismissed." *Id*. at 45. This is the sum of the allegations related to Ms. Howe, the totality of which is the foundation on which the Complaint rests the following conclusory statement: "Ms. Howe's performance, age, wisdom, ability to empower, engage and mobilize others, her sexual orientation and progress building a network of county resources to effect real change were a threat to the existing power structure." *Id*.

*Allegations Related to Plaintiff L. Jani Sheppard*

Plaintiff Sheppard describes herself as an African American heterosexual woman over the age of 40. *Id*. at 13. Ms. Sheppard is currently still employed by the County. Plaintiffs allege that

1    Defendant Chandler sent certain messages to Ms. Sheppard to the effect that "she was the prime

2    suspect in disseminating information to Ms. Howe about [the appearance of the word] 'Dis-ease'

3    on the HHSA white boards." *Id.* at 13-15. The Complaint then alleges that in the Fall of 2019,

4    Defendants launched a "retaliatory and unfounded racial discrimination investigation" against Ms.

5    Sheppard based on something undescribed that appears to have happened during a particular

6    training session overseen by Ms. Sheppard (the Complaint leaves out those details, merely

7    labeling the investigation as "retaliatory and unfounded" and leaving it at that). *Id.* at 15. A law

8    firm was recruited to conduct the investigation, and the Complaint alleges that Ms. Sheppard was

9    cleared of any wrongdoing in January of 2020. *Id.* at 15-16. The Complaint then notes that Ms.

10   Sheppard was (at some point in time) demoted, but then adds that the demotion was attended with

11   a number of "false representations . . . in an attempt to deceive her into believing that she was not

12   protected by the civil service system and was not a member of the union." *Id.* at 16. The

13   Complaint, however, does not detail any of these statements; instead, they are only referenced in

14   the abstract while being labeled as "false" no fewer than five times on the same page. *See id.*

15         Initially, it is important to note that Ms. Sheppard was an equal stakeholder with Ms. Howe

16   in the episode recited above where they refused to follow their bosses' directives in refraining

17   from giving Ms. Corrado a bad performance review. *See id.* at 34 ("Ms. Sheppard presented to Ms.

18   Corrado her performance evaluation with the marks Ms. Sheppard and Ms. Howe [made, which]

19   accurately reflected her sub-par performance."). That said, the essence of Ms. Sheppard's pertinent

20   allegations (which are still littered with conclusory content, unreasonable inferences, and missing

21   causal connections) appears in Paragraphs 98 and 99. In this regard, the Complaint notes that

22   "[h]aving failed in their unlawful scheme to terminate Ms. Sheppard or force her out due to

23   intolerable working conditions," Defendants demoted Ms. Sheppard. *Id.* at 17. The Complaint then

24   adds that the "demotion was made with knowledge of [Ms. Sheppard's] protected activities,"

25   referring vaguely to: Ms. Sheppard joining a government complaint filed by Ms. Howe; Ms.

26   Sheppard making certain complaints about discrimination based apparently on a single double-

27   hearsay comment by one of her subordinates; and Ms. Sheppard's public criticism of her bosses,

28   which she casually re-labels as her "speaking on matters of public interest." *Id.*

United States District Court
Northern District of California

13

1     Before Ms. Howe's "compelled" resignation, under Ms. Howe's leadership, Ms. Sheppard

2     worked on a project to update the County's tobacco use ordinance. *Id*. at 22. From 2018 until

3     2020, Ms. Sheppard and her staff met with a coalition of the County's partners (which the

4     Complaint identifies as the "Tobacco Prevention Coalition") on a monthly basis. *Id*. at 23. At one

5     of these events, Ms. Sheppard spoke with a member of the County Board of Supervisors and asked

6     him if he would be a candidate for a program called "Key Informant Interviews." *Id*. at 22-23.

7     While the timelines in the Complaint are far from clear, it appears that either before or after this

8     conversation, but sometime in early 2019, Defendant Chandler informed her subordinates,

9     including Ms. Sheppard, that they were prohibited from speaking with members of the Board of

10    Supervisors about matters related to the Tobacco Retail License Ordinance issue. *Id*. at 23. Despite

11    that admonition, and despite the fact that Defendant Chandler "re-enforced the prohibition that

12    Public Health staff . . . not speak with [members of the County Board of] Supervisors . . . Ms.

13    Sheppard arranged a lunch with the [m]ayors of each [c]ity and a member of the [Board of

14    Supervisors] to pass the [f]lavor ban portion of the [Tobacco Retail License Ordinance]." *Id*. at 23-

15    24. Given that this event had been organized in direct contravention of Defendant Chandler's

16    orders, the Complaint states that Defendant Chandler "prohibited Ms. Sheppard from completing

17    the strategic plan to organize the [m]ayors and demanded that she cancel the event." *Id*. at 24. At

18    subsequent meetings of the tobacco coalition, Ms. Sheppard (by her own account) reportedly told

19    the coalition members that her boss (Defendant Chandler) "is not able to engage in formal

20    strategic planning and provide responsive feedback" such that County business might move

21    forward. *Id*. at 25. Despite the express prohibition, Ms. Sheppard continued to try to communicate

22    (directly and indirectly) with members of the County Board of Supervisors by, for example,

23    attempting to inject her views into the agendas for upcoming meetings of the Board. *Id*.

24    Thereafter, Ms. Sheppard was reportedly demoted by two levels, but upon hiring an attorney, her

25    two-level demotion was reduced to a one-level demotion. *Id*. In fact, the Complaint makes it clear

26    that Ms. Sheppard disparaged Ms. Chandler's ability to run HHSA at more than one meeting with

27    various coalition associates and partners of the County. *See id*. at 25-26. It was after one of these

28    meetings, at which Defendant's Chandler's ability to run HHSA was disparaged, that Ms.

United States District Court
Northern District of California

14

1   Sheppard contends "it became clear that [Defendant Chandler] had ulterior motives," and the

2   "sham" discrimination investigation focusing on Ms. Sheppard was initiated. *Id*. at 26.

3          In the aftermath of Ms. Howe's "compelled termination," the Complaint alleges that

4   Defendants "were keen on discovering and punishing any person who was identified, rightly or

5   wrongly, with the dissemination of information about the falsehoods [that Defendant Chandler]

6   spread about the nature of Ms. Howe's compelled termination." *Id*. at 46. In this regard, the

7   Complaint alleges that "Ms. Sheppard was very high on the list of targets . . . [as such, Defendant

8   Chandler] was starting to isolate Ms. Sheppard and restricting her authority in her position." *Id*. at

9   47. While the connection seems unclear, the Complaint notes that one of Ms. Sheppard's

10  subordinates (at some point) allegedly referred to her as "an angry black woman," in addition to

11  which (but without any details) the Complaint also alleges that "Ms. Sheppard was receiving

12  culturally insensitive feedback from another one of her direct reports [as well]." *Id*. at 47, 50.

13  Also, (and similarly without any details) the Complaint notes that certain programs that were

14  "championed by Ms. Sheppard were undermined by the unwritten policies and what would evolve

15  into an absurd investigation of Ms. Sheppard for discrimination based upon dishonest and

16  uninformed allegations." *Id*. at 47-48. Once again, where the Complaint should include details and

17  facts that show an entitlement to relief under the claims asserted, there is little offered aside from

18  mere labels, baseless legal conclusions, a pervasive and illiberal innuendo coupled with scurrilous

19  epithets that seem to needlessly call people's sexuality into the equation. *See id*. at 47-49. Again

20  without details, the Complaint notes that, as part of some sort of lesbian conspiracy to force Ms.

21  Sheppard out of her job, "Ms. Corrado complained to Defendant Fengler, and (sic) outspoken

22  LGBTQ advocate[,] and Julie Beardsley, the union representative . . . [who] are uninformed about

23  cultural (sic) and uninformed about cultural competence, [all of whom] devised the uninformed

24  discrimination allegations against Ms. Sheppard [and] [u]pon information and belief, Ms. Fengler

25  identifies as female, lesbian." *Id*. at 49. The investigation eventually cleared Ms. Sheppard of

26  wrongdoing. *Id*. at 51.

27         The allegations related to Ms. Sheppard's role in this case then came to an end with a few

28  more conclusory statements for good measure. The bare-bones conclusory allegation merely states

United States District Court
Northern District of California

1    that (at some point) Mr. Sheppard was denied a position for which she applied and was qualified,

2    and the position was given to a person named Mr. Johnson, a less-qualified non-African-American

3    individual. *Id*. at 52. Plaintiffs add nothing more in this regard except to note in conclusory fashion

4    that "Mr. Johnson was awarded the position because [Defendant Chandler's] nepotism and

5    cronyism ensure that the hiring practices promote those persons whom [Defendants] [] can control,

6    intimidate, and threaten, like Heidi Corrado." *Id*.

7    *Allegations Related to Plaintiff Carol Morgan*

8           Ms. Morgan, a registered nurse, was employed by HHSA in December of 2017 as a Senior

9    Public Health Nurse in the County's Foster Care Program. *Id*. at 17-18. In one portion, the

10   Complaint alleges that in early 2020, "the County sought to appoint a person for a promotional

11   position [but] [i]n violation of law, Defendants promoted a less-qualified *preferred* candidate over

12   one selected pursuant the (sic) written policies." *Id*. at 18 (emphasis added). Then, elsewhere in

13   the Complaint it becomes apparent that the gist of Ms. Morgan's allegations entail another

14   seemingly routine course of workplace events that Plaintiffs once again refer to as "compelled

15   speech," where Defendant Convery – Ms. Morgan's immediate supervisor – "attempted to obtain

16   a signature on a required County document against the employee's will, ethics, and good

17   conscience." *See id*. at 35-39.

18          In early 2020, when HHSA announced a job vacancy, Defendant Convery asked Ms.

19   Morgan to participate in the interview process. *Id*. at 36. During the interview, Defendant Convery

20   reportedly told Ms. Morgan that management had already decided to promote the candidate then

21   being interviewed (Ms. Hashimoto); that interviews would no longer be necessary; and, that there

22   was no need for the formality of Ms. Hashimoto completing a certain questionnaire from the

23   human resources department. *Id*. at 37. The Complaint then asserts that the reason the

24   questionnaire is ordinarily used is such that interviewers can have some basis on which to compare

25   the merits of the various candidates – meaning that if a decision had already been made by

26   management to promote Ms. Hashimoto, the questionnaire would be superfluous. *Id*. At this point,

27   the Complaint ventures to relate the following irrelevant statements, at least as far as Plaintiffs'

28   federal claims are concerned: Ms. Hashimoto "was a favored subject"; Ms. Convery coached Ms.

United States District Court
Northern District of California

16

1   Hashimoto through the interview process such as to maximize her salary; the County never

2   disciplined Defendant Convery; the County refused to assign a new supervisor for Ms. Morgan;

3   and, "the use of public funds to curry favor and create malleable employees is a common

4   characteristic . . . [that] allowed [m]anaging [a]gents to leverage the employees for their desired

5   outcomes." *Id*. 37-38.

6           Sifting through what can only be described as the bombastic meandering that dominates

7   this Complaint in search of allegations about facts of consequence – that is, things that actually

8   happened, one finds a relatively simple series of events that appear to have been profoundly

9   obfuscated by the Complaint's narrative approach. Following Ms. Hashimoto's interview,

10  Defendant Convery repeatedly instructed Ms. Morgan to complete a questionnaire on Ms.

11  Hashimoto's behalf. *See id*. at 38-39. This was something that Ms. Morgan did not wish to do. *Id*.

12  Without anything further, and building only on the flawed foundation describe above (to wit,

13  Defendant Convery asked Ms. Morgan to complete some undescribed questionnaire on Ms.

14  Hashimoto's behalf), the Complaint makes the following series of conclusory statements: (1) if

15  Ms. Morgan had complied with her supervisor's directive to complete the questionnaire, she could

16  have been terminated for misconduct; (2) that "Ms. Morgan experienced severe emotional distress

17  from the fraudulent conduct and the failure of HHSA to correct itself"; that making Ms. Morgan

18  complete a form for Ms. Hashimoto constituted "demanding [that] employees engage in

19  compelled speech, with viewpoint discrimination and with the fraudulent goal to falsify

20  documents"; and, that Defendants "put Ms. Morgan in a very stressful position and were

21  indifferent to their violations of well-established constitutional rights and the negative professional

22  impact [that] compliance with the fraud and undue influence would have on Ms. Morgan's

23  career." *Id*. at 38-39. The lack of any causal connection between the only pertinent factual

24  allegation (Ms. Convery directed Ms. Morgan to complete a questionnaire for Ms. Hashimoto) and

25  this parade of conclusory statements about "compelled speech" and "fraud" and so on, has not

26  materially changed since the previous iteration of this Complaint that was dismissed by Judge

27  Illston. *See Howe-I*, Case No. 20-cv-2622-SI (dkt. 31) at 39-43.

28  //

United States District Court
Northern District of California

*Other Allegations*

The Complaint then dedicates nearly three pages in complaining about an allegedly hostile work environment experienced by a non-party named Anne Molgaard, presumably to bolster Plaintiffs' effort to cast Defendants in a generally bad light. *See id*. at 52-54. Lastly, the factual allegations portion of the Complaint finishes with nearly three pages of generalized conclusory statements, a few examples of which are as follows: (1) the result of Defendants' "retaliation" was to thwart the development of Ms. Howe and Ms. Sheppard, and to thwart Ms. Morgan in providing medical services to foster children; (2) Defendants "divert financial and other resources to no-work contracts and acceptance of low or non-performing employees all in return for loyalty and favors"; "the public health profession is readily aware of the treatment potential offerees receive in accepting employment with the County"; Defendants "can only attract an ex-felon public health officer who was chased out of Nevada after years of malfeasance, non-performance and other derelictions of duty"; and, Defendants operate and enforce "[i]llegal [policies and procedures] based upon the terms of cronyism, nepotism, corruption, retaliation, abuse, grant diversion, and depriving meritorious employees of their constitutional rights, due process, and the (sic) benefits." *Id*. at 54-56.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted in the event that a plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "facial plausibility" standard requires plaintiffs to allege a quantum of facts that combine to constitute "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts are not so inflexible as to require heightened fact pleading attended with minute levels of detail, a plaintiff must nevertheless allege enough actual facts such as to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. In the course of this inquiry, complaints are to be construed in a light most favorable to the plaintiff and all *properly pleaded* factual allegations are to be accepted as true. *See e.g., Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *see also Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d

226, 228 (9th Cir. 1994). All reasonable inferences, therefore, are to be drawn in a plaintiff's favor. *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir. 1997). As opposed to properly pleaded factual allegations, courts are not required to presume the truth of unreasonable inferences or conclusory legal statements that might be cast in the form of factual allegations. *See Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *Miranda v. Clark County, Nev.*, 279 F.3d 1102, 1106 (9th Cir. 2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 987 ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), *as amended*, 275 F.3d 1187 (9th Cir. 2001).

Courts may also disregard allegations in a complaint if they are contradicted by other allegations in a complaint, or by facts established by exhibits attached to the complaint. *See Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987). Furthermore, courts are not required to accept as true allegations that contradict facts which may be judicially noticed. *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987). In adjudicating a motion to dismiss, courts may also consider matters of public record, including pleadings, orders, and other papers filed with the court. *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1282 (9th Cir. 1986).

As for the type of dismissal to be entered, when a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). In the course of this inquiry, courts should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989). Among these factors, prejudice to the opposing party is given the greatest weight. *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971)). Lastly, dismissal

1   with prejudice is also suitable in situations "where the amendment would be futile." *DeSoto v.*

2   *Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992).

3                                    **DISCUSSION**

4           The current iteration of Plaintiffs' Complaint is 91 pages long, the previous two iterations

5   consisted of 86 and 131 pages respectively; and, when the irrelevant statements, conclusory

6   assertions, and all of the labels and epithets are excised and distilled, the instant Complaint (dkt. 1)

7   suffers from the same exact defects that were noted in Judge Illston's two dismissal orders.

8   Therefore, as explained below, because Plaintiff's federal claims will be dismissed with prejudice,

9   the court will also dismiss Plaintiff's state-law claims as the relevant considerations of judicial

10  economy, convenience, and fairness to the litigants counsel in favor of leaving the California

11  claims to the sound judgment of a California court.[2]

12  **§ 1983 Claims Against the County of Mendocino**

13          In order to properly articulate a § 1983 claim against a municipality, it is incumbent on

14  plaintiffs to show that the defendant municipality's employees or agents acted pursuant to an

15  official custom, pattern, or policy that violates the plaintiff's civil rights. *See Monell*, 436 U.S. at

16  690-91. Therefore, liability does not automatically attach to a municipal entity simply by virtue of

17  having employed one or more alleged wrongdoers; thus, the doctrine of *respondeat superior* does

18

19  _____
    [2] The purposes underlying discretionary supplemental jurisdiction are rooted in considerations of judicial
20  economy, convenience and fairness to litigants. *See United Mine Workers of America v. Gibbs*, 383 U.S.
    715, 726 (1966); *see also Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988) ("the doctrine of
21  pendent jurisdiction . . . is a doctrine of flexibility, designed to allow courts to deal with cases involving
    pendent claims in the manner that most sensibly accommodates a range of concerns"). However, in 1990,
22  when Congress enacted 28 U.S.C. § 1367 in order to codify the standard governing supplemental
    jurisdiction in civil actions, it was noted that one circumstance in which § 1367(c)(3) permits the rejection
23  of supplemental jurisdiction over a state-law claim when a district court has dismissed all claims over
    which it has original jurisdiction. In *Gibbs*, the Supreme Court noted two situations in which the factors of
24  "judicial economy, convenience and fairness to litigants" will generally weigh strongly in favor of the
    dismissal of supplemental state law claims. *See Gibbs*, 383 U.S. at 726-27. Thus, long before the
25  codification of § 1367, the *Gibbs* Court stated that as a general rule, courts should not exercise
    supplemental jurisdiction over state law claims if all federal claims have been dismissed before trial. *Id.* at
26  726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a
    jurisdictional sense, the state claims should be dismissed as well"); *see also Wren v. Sletten Const. Co.*, 654
27  F.2d 529, 536 (9th Cir. 1981) ("When the state issues apparently predominate and all federal claims are
    dismissed before trial, the proper exercise of discretion requires dismissal of the state claim"); *but see*
28  *Carnegie-Mellon*, 484 U.S. at 350 n. 7 (noting that this is not a mandatory rule, but merely a recognition
    that, when all federal claims are dismissed, the balance often tips in favor of dismissal).

United States District Court
Northern District of California

not trigger municipal liability under § 1983. *See Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). In the § 1983 context, for liability purposes, local governments are considered "persons" that are subject to liability when an official policy, practice, or custom *causes* a constitutional tort. *See Monell*, 436 U.S. at 690. More specifically, a municipality may be held liable based on an unconstitutional policy even where it is not an express municipal policy that has been formally adopted, as the Supreme Court has recognized that a municipality may be held liable on the basis of an unconstitutional policy if the plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).  Thus, to withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of something more than the mere formulaic recitations of the existence of unlawful policies, conduct or habits. *See e.g., Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011) (affirming dismissal where complaint "lacked any factual allegations . . . demonstrating that [the] constitutional deprivation was the result of a custom or practice [] or that the custom or practice was the 'moving force' behind [the] constitutional deprivation").

In the instant action, Plaintiffs have repeatedly failed to show that the County of Mendocino, the municipal defendant, had or now has employees or agents who acted pursuant to an official policy, custom, pattern, or practice that caused a violation of Plaintiffs' rights. Throughout each iteration of Plaintiffs' attempts at pleading a municipal liability claim, Plaintiffs have been able to say nothing more than to allege that inaction by the County's Board of Supervisors has created a "power vacuum" that allows the directors and managers of HHSA to act in ways that are not to Plaintiffs' liking. While each of Plaintiffs' multiple attempts at pleading this claim are teeming with labels such as "illegal policies and procedures," the pleadings say nothing about what exactly those policies, practices, or customs are, let alone how those supposedly "illegal policies and procedures" *caused* any constitutionally cognizable harm. Instead, Plaintiffs merely mention that the County's Board of Supervisors "have an established practice of failing to formally establish and monitor policies to address county-wide issues of public safety,

health, economic and other needs of the community . . . [and that] [t]he Managing Agents of the County filled the vacuum created by the established practice of the county [] to fail to formally establish and monitor policies by establishing discriminatory and unlawful practices to benefit their individual and collective interests." *See* Compl. (dkt. 1) at 9-10. As Judge Illston noted, this is not enough, nor is that defect cured by referring to and quoting from some alleged Civil Grand Jury Reports (*see id*. at 18-21) that include a few generalized statements that supposedly offer criticism of the County's management. Simply saying that the County does not have policies that would prevent HHSA management from doing things with which Plaintiffs disagree is not enough to establish an official policy, practice, or custom, that operated to cause Plaintiffs to suffer constitutionally cognizable harms. For the third time, Plaintiffs have failed to tether their allegations together, and therefore, Plaintiffs have failed yet again to properly plead any *Monell* claims.

### § 1983 Claims Against Defendants in their Individual Capacity

A plaintiff may sue defendants in their individual capacity under § 1983. *Hafer v. Melo*, 502 U.S. 21, 31 (1993). Under § 1983, a supervisor can be held liable in his or her individual capacity when it can be shown that either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection can be established between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). However, it should be noted that "the distinction between official-capacity suits and personal-capacity suits is more than a mere pleading device." *McAllister v. Los Angeles Unified School Dist.*, 216 Cal. App. 4th 1198, 1212 (2013) (citing *Hafer*, 502 U.S. at 27) (internal citation and quotation marks omitted). "The requisite causal connection can be established . . . by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011). Thus, a supervisor may "be liable in his [or her] individual capacity for his [or her] own culpable action or inaction in the training, supervision, or control of his [or her] subordinates; for his [or her] acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous

United States District Court
Northern District of California

22

1   indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting

2   Starr, 652 F.3d at 1208). Through three iterations of their complaint, Plaintiffs have failed to

3   allege either a constitutional depravation, or any causal connection for each defendant sued in an

4   individual capacity.

5   ***First Cause of Action: Illegal Intrusion on First Amendment Right Against Individuals***

6   While Plaintiffs have pleaded six ostensibly separate federal causes of action, there is a

7   great deal of overlap and repetition. *See* Compl. (dkt. 1) at 56-74. Plaintiffs' first cause of action,

8   brought pursuant to § 1983, asserts that Defendants Chandler, Schurtz, Convery, Fengler, and

9   Does 4-70, in their individual capacities, effected an "illegal intrusion on [Plaintiffs'] First

10  Amendment rights." *See* Compl. (dkt. 1) at 56-59. In support of this claim, Plaintiffs reiterate

11  much of the essence of what was recited above, wherein they have re-labeled their workplace

12  restrictions and directives as constituting "government restrict[ion] [of] speech," or the "coercing

13  or compelling [of] speech," or being precluded "from engaging in protected speech activity." *Id.* at

14  57-58. At bottom, the essence of this claim is that "Plaintiffs' speech and refusal to engage in

15  compelled speech was a substantial motivating factor for the adverse employment actions taken

16  against them by Defendants." *Id.* at 58.

17  Plaintiffs seem to labor under the misapprehension that the First Amendment gives them

18  license to defy their employer's directives – and, then to couch their own insubordinate actions as

19  constitutionally protected speech. That is not the case. *See Connick v. Myers*, 461 U.S. 138, 149

20  (1983) ("To presume that all matters which transpire within a government office are of public

21  concern would mean that virtually every remark – and certainly every criticism directed at a public

22  official – would plant the seed of a constitutional case. While as a matter of good judgment, public

23  officials should be receptive to constructive criticism offered by their employees, the First

24  Amendment does not require a public office to be run as a roundtable for employee complaints

25  over internal office affairs."). But this is precisely the outcome that Plaintiffs seek – they seek to

26  fashion a weapon from the First Amendment such that they can effectively use it to transform their

27  workplace into a roundtable where they may be equal partners with their managers and

28  supervisors.

United States District Court
Northern District of California

In order to properly plead a claim for an incident of free speech intrusion under § 1983, a plaintiff must allege that, by their actions, the defendant(s) deterred or chilled the plaintiff's protected speech and such deterrence was a substantial or motivating factor in the defendant(s)' conduct. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994)); *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[T]he proper inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities."). Therefore, in order to survive dismissal of their first cause of action for illegal intrusion into Plaintiffs' free speech rights, it was incumbent on Plaintiffs to allege specific facts showing the individual Defendants' personal participation in a deprivation of Plaintiffs' rights with respect to protected speech; and, as mentioned above, conclusory statements are simply not enough. *See Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Here, Plaintiffs have largely filled their Complaint with conclusory statements and mere labels about "compelled speech," "denial of free speech," "compelled unlawful and fraudulent speech," and the "refusal to engage in compelled speech for the benefit of preferred employees." *See e.g.,* Compl. (dkt. 1) at 6, 9, 17.

Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making *protected speech*. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007) (citing *Pickering v. Board of Education*, 391 U.S. 563 (1968)). In order "[t]o state a First Amendment claim against a public employer, an employee must show: (1) that the employee engaged in constitutionally protected speech; (2) that the employer took adverse employment action against the employee; and (3) that the employee's speech was a substantial or motivating factor for the adverse action." *Marable*, 511 F.3d at 929. To qualify as "constitutionally protected speech," the employee must have uttered the speech in question as a citizen, not as an employee; because when public employees make statements in pursuit of their official duties, those statements do not receive First Amendment protection. *See Marable*, 511 F.3d at 929 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2005)). Whether or not an episode of particular speech is constitutionally protected is a legal question. *Marable*, 511 F.3d at 930.

1    Here, Plaintiffs' only effort at couching the speech at issue as constitutionally-protected is

2    to simply label it as such. *See e.g., id*. at 58 (mentioning how the treatment of a non-party, Ms.

3    Carol Mordhorst, "would dissuade a reasonable employee . . . from engaging in protected speech

4    activity.") In reality, each instance described in the Complaint (as recited above) where Plaintiffs

5    contend they were either subjected to "compelled speech," or when they were disciplined for

6    something they said (such as when Plaintiffs Howe and Sheppard publicly undermined their

7    supervisors by speaking ill of them) constituted speech in their capacity as employees, and

8    because those statements were all made as part of the discharge of their duties as employees, they

9    do not qualify as constitutionally-protected speech. Aside from failing to show that any of the

10   speech discussed in this Complaint was constitutionally protected, despite using over 300 pages in

11   three iterations, Plaintiffs have similarly failed to allege what actions, if any, Defendants took to

12   chill even un-protected speech, let alone alleging facts to establish that such deterrence was a

13   substantial or motivating factor in the Defendants' actions. Accordingly, because of its failure to

14   state a cognizable claim, Plaintiffs' first cause of action is **DISMISSED**.

15   **_Second Cause of Action: Illegal Intrusion on First Amendment Right Against County_**

16   As mentioned, there is a great deal of overlap and repetition attending Plaintiffs'

17   formulation and presentation of their claims. The second cause of action asserts a § 1983 claim

18   against Mendocino County for an "illegal intrusion" on Plaintiffs' rights under the First

19   Amendment. *See* Compl. (dkt. 1) at 59-64. This claim entirely rests on a foundation of conclusory

20   legal statements. *See id*. However, as stated above, Plaintiffs have failed to show: (1) that any of

21   the speech identified in their Complaint was constitutionally-protected, or (2) (assuming their

22   speech was protected) any causal connection between such speech and any harm that has been

23   alleged, or (3) that any policy, practice, or custom instituted by the County caused them to suffer

24   any of the alleged harms. Accordingly, because it fails to state a cognizable *Monell* claim,

25   Plaintiffs' second cause of action is **DISMISSED**.

26   **_Third Cause of Action: Retaliation Claim Against Individuals_**

27   Plaintiffs' contend that the above-recited factual allegations (that is, the properly pleaded

28   allegations that have been distilled and separated from the irrelevant matter, the labels, the bluster,

United States District Court
Northern District of California

25

and the conclusory legal statements) also make out a claim against the individually-named Defendants for retaliation under the First Amendment. *See* Compl. (dkt. 1) at 64-68. In order to survive a dismissal motion on this cause of action, Plaintiffs must competently allege that (1) they spoke on a matter of public concern; (2) that they spoke as a private citizen rather than a public employee; (3) that the Plaintiffs' protected speech was a substantial or motivating factor in the ensuing adverse employment action; (4) that the municipal employer did not have an adequate justification for treating the employee differently from other members of the general public; and (5) that the municipal employer would not have taken the adverse employment action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). "[F]ailure to meet any one of [these factors] is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1091 n.4 (9th Cir. 2013) (*en banc*).

It is axiomatic that the state or a municipality may not abuse its position as an employer in order to stifle "the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest." *Pickering*, 391 U.S. at 568. Acknowledging the existence of reasonable limits on a state's ability to silence its employees, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

As mentioned above, Plaintiffs bear the burden of showing that the speech in question addressed an issue of public concern. *See generally Connick*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *see also Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001). "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick*, 461 U.S. at 146). But "speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110,

1114 (9th Cir. 1983)). "'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Johnson*, 48 F.3d at 422 (quoting *Connick*, 461 U.S. at 147-48). The public concern inquiry is purely a question of law. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006) (citing *Hyland v. Wonder*, 972 F.2d 1129, 1134 (9th Cir. 1992)). If the speech in question does not address a matter of public concern, then the speech is unprotected, ending the inquiry. Some, but not all, of the speech at issue in this case does fit this description.

Second, Plaintiffs bear the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee. *See Garcetti*, 547 U.S. at 421-22; *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1126-27 (9th Cir. 2008). "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Posey*, 546 F.3d at 1127 n.2 (internal quotations and alterations omitted) (quoting, respectively, *Marable v. Nitchman*, 511 F.3d 924, 932-33 (9th Cir. 2007), and *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006)). While "the question of the scope and content of a plaintiff's job responsibilities is a question of fact," the "ultimate constitutional significance of the facts as found" is a question of law. *Id.* at 1129-30. In evaluating whether a plaintiff spoke as a private citizen, courts must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities; and if – as is the case here – the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected. *Eng*, 552 F.3d at 1071. As stated above, all of the speech identified by this Complaint as "protected speech" was uttered in the course of what each Plaintiff's allegations contend to have been their employment duties and not in any of their capacities as private citizens – a conclusion that is bolstered by the fact that Plaintiffs' repeatedly assert that that they suffered adverse employment actions for being *too good* at their jobs (conclusively indicating that the speech discussed in the Complaint was uttered in their capacities as employees, not as private citizens). *See* Compl. (dkt. 1) at 41 ("Defendants forced Ms. Howe to resign because she absorbed and implemented [various "leadership" programs under names like "Turn the Ship Around" and "Leadership at All Levels,"] which earned her the

United States District Court
Northern District of California

1  trust and utmost respect of her staff, peers, and the public."); *see id*. at 23-26 (Ms. Sheppard was

2  directed not to speak directly with members of the County Board of Supervisors, something which

3  she continued to do after being directed not to; and, Ms. Sheppard similarly spoke ill of her

4  supervisors publicly due to concerns she developed in her official capacity as an employee, stating

5  that Defendant Chandler "is not able to engage in formal strategic planning and provide responsive

6  feedback"); *see also id*. at 17-39 (Plaintiffs' only pertinent allegations regarding Ms. Morgan were

7  that Defendants instructed her to complete a questionnaire on someone else's behalf, not that she

8  suffered an adverse employment action due to any purportedly protected speech). Accordingly,

9  this claim fails on the second prong for Ms. Howe and Ms. Sheppard, and on all prongs for Ms.

10  Morgan.

11  In any event, the third prong of this inquiry requires Plaintiffs to show that the state "took

12  adverse employment action . . . [and that the] speech was a 'substantial or motivating' factor in the

13  adverse action." *Freitag*, 468 F.3d at 543 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973

14  (9th Cir. 2003)); *see also Marable*, 511 F.3d at 930, n.10 ("It is [the plaintiff]'s burden to show

15  that his [or her] constitutionally protected speech was a motivating factor in [the state]'s adverse

16  employment action."). However, this inquiry is unnecessary due to the fact that Plaintiffs have

17  failed to show that there was any constitutionally-protected speech involved in this case;

18  consequently, they have also failed to show any causal connection between any protected speech

19  and any adverse employment action. As stated above, each and every adverse employment action

20  described in this Complaint was a result of insubordination that is clear from the face of the

21  Complaint, or routine workplace disagreements and bickering that are of no constitutional

22  significance.

23  The fourth prong of this inquiry is only undertaken if a plaintiff were to pass the first three

24  steps, in which case, the burden would shift to Defendants to show that "under the balancing test

25  established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the

26  employee's First Amendment rights." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir.

27  2004); *see also CarePartners*, 545 F.3d at 880. This inquiry, known as the *Pickering* balancing

28  test, asks "whether the relevant government entity had an adequate justification for treating the

28

United States District Court
Northern District of California

1    employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.

2    However, given that none of the Plaintiffs have passed the first three prongs, it is unnecessary for

3    the court to undertake a *Pickering* balancing test.

4             Thus, Plaintiffs have not adequately pleaded the existence of protected speech in this case,

5    and even if they had, they have failed to allege facts showing that any putatively protected speech

6    was a "substantial or motivating factor" leading to the adverse employment actions they describe,

7    nor have they adequately alleged a causal link between what would have been protected speech

8    and any alleged retaliation. Once again, despite three amendments, Plaintiffs' allegations are still

9    conclusory and not pleaded with sufficient particularity. Accordingly, Plaintiffs third cause of

10   action similarly fails to state a claim and is therefore **DISMISSED**.

11   ***Fourth Cause of Action: Retaliation Claim Against County***

12            Plaintiffs' fourth cause of action asserts a § 1983 claim against Mendocino County for

13   retaliation against Plaintiffs' exercise of their rights under the First Amendment. *See* Compl. (dkt.

14   1) at 68-71. Once again, this claim rests exclusively on a foundation of conclusory legal

15   statements. *See id*. However, as stated above, Plaintiffs have failed to show (1) that any of the

16   speech identified in their Complaint was constitutionally-protected, or (2) that (assuming it was

17   protected), Plaintiffs have failed to allege any causal connection between such speech and any

18   harm that has been alleged, or (3) that any policy, practice, or custom instituted by the County

19   caused them to suffer any of the alleged constitutional depravations. Accordingly, because it fails

20   to state a cognizable *Monell* claim, Plaintiffs' fourth cause of action is **DISMISSED**.

21   ***Fifth Cause of Action: Wrongful Termination or Reduction Claim Against Individuals***

22            In this regard, the Complaint provides a single sentence dedicated to each Plaintiff that

23   simply states that each respective plaintiff was denied a property interest in her employment, and

24   was harassed and discriminated against. *See* Compl. (dkt. 1) at 72-73. The entirety of the factual

25   allegations contained the in the Complaint – as recited above – do not come anywhere close to

26   pleading either a property claim or an equal protection claim under the Fourteenth Amendment.

27            "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

28   'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

1    direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

2    *Living Ctr.*, 473 U.S. 432, 439 (1985). "To state a § 1983 claim for violation of the Equal

3    Protection Clause[,] a plaintiff must show that the defendants acted with an intent or purpose to

4    discriminate against the plaintiff based upon membership in a protected class." *Thornton v. City of*

5    *St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (citation and internal quotation marks omitted).

6    Plaintiffs were previously instructed in this regard in Judge Illston's second dismissal order (*see*

7    *Howe-I*, Case. No. 20-cv-2622-SI, Order (dkt. 43) at 8-9. However, that instruction appears to

8    have fallen on deaf ears because neither has <u>*anything*</u> of substance been added to the instant

9    Complaint in this regard, nor have the claims been removed. *Compare Howe-I*, FAC (dkt. 31) at

10   68-69, *with Howe-II*, Compl. (dkt. 1) at 72-73. Additionally, Plaintiffs allege (quite literally by

11   repeatedly using various formulations of the phrase "right to property" and nothing more) (*see*

12   Compl. (dkt. 1) at 72-73) that the adverse actions they claim to have suffered also implicated their

13   property rights in their employment, however in order to assert such a claim, plaintiffs must

14   establish the basis for their claimed property interest in her continued employment – something

15   which these Plaintiffs have failed to do through several iterations of their complaints. *See*

16   *generally Bd. of Regents v. Roth*, 408 U.S. 564, 567-76 (1972).

17       In any event, because Plaintiffs have failed to allege anywhere near the requisite quantum

18   of facts to support either an equal protection claim, or the denial of a property interest in continued

19   employment claim – particularly since being expressly warned in that regard prior to the previous

20   dismissal of their FAC by Judge Illston –Plaintiffs' fifth claim for relief must likewise be

21   dismissed due to the failure to plead any facts that might support any cognizable legal theory in

22   these regards. The rote and mechanical recitation of the phrases, "right to property" or "equal

23   protection," is not sufficient to survive a motion to dismiss because dismissal under Rule 12(b)(6)

24   is proper when the complaint either lacks a cognizable legal theory, or fails to allege sufficient

25   facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d

26   1097, 1104 (9th Cir. 2008); *see also Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

27   Accordingly, Plaintiffs' fifth cause of action is **DISMISSED**.

28   //

United States District Court
Northern District of California

30

1    ***Sixth Cause of Action: Wrongful Termination or Reduction Claim Against County***

2        Plaintiffs' sixth cause of action asserts a § 1983 claim against Mendocino County for

3    wrongful termination against Ms. Howe and wrongful reduction against Ms. Sheppard and Ms.

4    Morgan in what they assert to have been a violation of their due process rights. *See* Compl. (dkt.

5    1) at 73-74. Once again, this claim rests exclusively on a foundation of conclusory legal

6    statements. *See id*. First, the court will note that this cause of action was pleaded in a virtually

7    identical manner in *Howe-I* in Plaintiffs' FAC. *Compare Howe-I*, Case No. 20-cv-2622-SI, FAC

8    (dkt. 31) at 6-70, *with Howe-II*, Compl. (dkt. 1) at 73-74. The court must also note that once again,

9    Plaintiffs appear to have ignored Judge Illston's admonitions when Plaintiffs' due process claim

10   was previously dismissed – Judge Illston noted in this regard that, "[t]he Court is not clear what

11   process each respective plaintiff was allegedly denied." *See Howe-I*, Case No. 20-cv-2622-SI,

12   Order (dkt. 43) at 9. Notwithstanding that dismissal, Plaintiffs have simply parroted those same

13   rote recitations about being denied notice and hearings prior to their adverse employment actions.

14   *See* Compl. (dkt. 1) at 73-74. However, it is unclear what sort of notice or hearing would be

15   required prior to Ms. Howe signing a resignation letter (nor is there any explanation to that effect

16   in this Complaint); Ms. Sheppard was demoted and then re-promoted by at least one level after she

17   decided "to hire an attorney to counsel her to restore at least one level" (*id*. at 25) which indicates

18   something other than the denial of process; and, as for Ms. Morgan, it is not even clear what, if

19   any, adverse employment action she suffered and what sort of process or notice would have been

20   required under the circumstances. Therefore, Plaintiffs have once again failed to plead enough

21   facts to support a cognizable legal theory. *See Somers*, 729 F.3d at 959.

22       Much more importantly, however, is the fact that Plaintiffs have directed their sixth cause

23   of action "against the County," and as stated above, quite apart from Plaintiffs' failure to show

24   exactly what was the process to which they were entitled and which was denied, they have failed

25   to show that any policy, practice, or custom instituted by the County was the cause of any alleged

26   constitutional depravation. Accordingly, because Plaintiffs fail to state a cognizable *Monell* claim,

27   Plaintiffs' sixth cause of action is **DISMISSED**.

28   //

United States District Court
Northern District of California

United States District Court
Northern District of California

*Nature of Dismissals*

Given that Plaintiffs have already been effectively granted leave to file two amended pleading and yet they have consistently failed to cure any of the defects identified by Judge Illston in their prior complaints, it is by now quite clear "that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency[s] [described herein]." *Schreiber Distrib. Co.*, 806 F.2d at 1401. In deciding this question, the court has considered all of the pertinent factors. The court has considered the undue delay that would be occasioned by permitting Plaintiffs to file another complaint. Also, the court has considered Plaintiffs' repeated failures to cure deficiencies through their prior amendments, despite clear instructions from the court. Most importantly, the court has considered the resulting prejudice to Defendants if they were made to answer yet another iteration of Plaintiffs' voluminous and convoluted complaints, which would most assuredly be followed by another motion seeking the dismissal of yet another episode of Plaintiffs' attempts at shoehorning their workplace disagreements into the mold of federal constitutional claims. In other words, the court finds that granting Plaintiffs leave to once again amend their pleading would be an exercise in futility. *See Moore*, 885 F.2d at 538; *Bank of Hawaii*, 902 F.2d at 1387; and, *Yellow Freight Sys.*, 957 F.2d at 658. Furthermore, given that the court has dismissed all of Plaintiffs' federal claims, the court will (based on the considerations of considerations of judicial economy, convenience, and fairness to the litigants, as described above) now exercise its discretion to also dismiss Plaintiffs' state-law claims such that they can be adjudicated, if Plaintiffs so choose, by a state-court judge.

## CONCLUSION

Accordingly, for reasons stated herein, Defendants' Motion to Dismiss (dkt. 11) is **GRANTED** and the entirety of the Complaint (dkt. 1) is **DISMISSED WITH PREJUDICE**. A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: September 7, 2021

ROBERT M. ILLMAN
United States Magistrate Judge